ATTORNEYS FOR APPELLANT
Mark E. Shere
Indianapolis, Indiana

Dale E. Stephenson
Allen A. Kacenjar
Squire, Sanders & Dempsey L.L.P.
Cleveland, Ohio

Mary Rose Alexander
Thomas Heiden
Latham & Watkins, LLP
Chicago, Illinois

Vicki Wright
Libby Mote
Krieg Devault, LLP
Indianapolis, Indiana

ATTORNEY FOR HARTFORD
ACCIDENT AND INDEMNITY
COMPANY
Knight Anderson
Indianapolis, Indiana

ATTORNEYS FOR CONTINENTAL
INSURANCE COMPANY
Mary Reeder
Elizabeth Green
Indianapolis, Indiana

ATTORNEY FOR LEXINGTON
INSURANCE COMPANY
David Temple
Indianapolis, Indiana

ATTORNEYS FOR INDIANA
ASSOCIATION OF CITIES AND TOWNS
Donald Snemis
Brent Huber
Freedom Smith
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
George M. Plews
Jeffrey D. Featherstun
Tina M. Richards
Plews Shadley Racher & Braun
Indianapolis, Indiana

Cheryl A. Greene
South Bend, Indiana

Michael Keele
Indianapolis, Indiana

ATTORNEY FOR ZURICH AMERICAN
INSURANCE COMPANY
Stephen Peters
Indianapolis, Indiana

ATTORNEY FOR CERTAIN
UNDERWRITERS AT LLOYD'S OF
LONDON
Bruce Kamplain
Indianapolis, Indiana

ATTORNEY FOR COMMERCIAL
LOGISTICS CORPORATION
Peter Rusthoven
Indianapolis, Indiana

ATTORNEY FOR ACF INDUSTRIES,
LLC
Geoffrey Slaughter
Indianapolis, Indiana

ATTORNEYS FOR INDIANA LEGAL
FOUNDATION
Bryan Babb
Matthew Klein
Indianapolis, Indiana

FILED
Jan 22 2009, 3:19 pm

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 49S04-0711-CV-541

COOPER INDUSTRIES, LLC,
*et al.,*

*Appellant (Plaintiff below),*

v.

The CITY OF SOUTH BEND, INDIANA,
*et al.,*

*Appellees (Defendants below).*

Appeal from the Marion Superior Court, No. 49F12-0303-PL-752
The Honorable Michael D. Keele, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 49A04-0511-CV-637

**January 22, 2009**

**Shepard, Chief Justice.**

The City of South Bend now owns much of the land where Studebaker Corp. once manufactured automobiles. It has sued Cooper Industries, LLC and others for environmental damage done to the site. In this appeal, the questions are whether the applicable statute of

2

limitation bars these claims and whether appellant Cooper Industries is the corporate successor to Studebaker such that it may be liable on these environmental claims.

We hold that the statute of limitation bars the City's common law claims, that its claim under the Environmental Legal Action statute accrued at the time the statute became effective and thus is not barred, and that Cooper is the corporate successor to Studebaker for these purposes.

**Facts and Procedural History**

From before the Civil War, Studebaker operated manufacturing facilities in the City of South Bend, eventually occupying more than a hundred acres. During the Twentieth Century, the plant produced primarily automobiles, until 1963, when Studebaker moved these operations to a Canadian subsidiary and disposed of its South Bend facilities. It later became apparent that significant soil and groundwater contamination had likely occurred during Studebaker's occupation of the land and buildings.

Most of the Studebaker assets and the assets of Worthington Corporation were combined in 1967 to form Studebaker-Worthington Corporation. Studebaker officially dissolved as a corporate entity on November 30, 1967. In 1979, McGraw-Edison Company acquired all of

Studebaker-Worthington's shares. In 2004, McGraw-Edison merged into appellant Cooper Industries, LLC ("Cooper").

Meanwhile, the City of South Bend began acquiring parcels of the former Studebaker property during the mid-1980s. Suspecting the presence of environmental contamination, the City hired two environmental consultants to conduct testing and report on their findings. On September 30, 1988, the first consultant reported that "a source of hydrocarbons may exist below the site or that the ground water may be transporting contaminants under the site." (Appellant's App. at 497.) On November 25, 1988, the second consultant reported "[volatile organic compound] contamination in the groundwater sample from each boring" and "heavy metal contamination in the groundwater sample from each boring" exceeding the EPA's national drinking water standards. (Id. at 513-15.) In 1990, the South Bend Redevelopment Commission formally declared the Studebaker property a redevelopment area. Over the next several years, the City continued to acquire property and evaluate the contamination. By 2002, the City owned a significant fraction of former Studebaker land.

On March 19, 2003, the City of South Bend and the South Bend Redevelopment Commission (collectively "South Bend") sued McGraw, contending that it was a successor to the liability of Studebaker. It pleaded negligence, private nuisance, trespass, public nuisance, statutory illegal dumping, and an environmental legal action (ELA) under Ind. Code § 13-30-9-2 (2009). (Appellant's App. at 32-50.) South Bend later substituted Cooper as defendant.

4

In January 2005, McGraw/Cooper moved for summary judgment on all claims, and both parties later moved for summary judgment as to whether McGraw/Cooper is the corporate liability successor of Studebaker. The trial court granted South Bend summary judgment on the issue of successorship. The court held that Studebaker-Worthington expressly assumed Studebaker's environmental liabilities, and in any event, that the Studebaker-Worthington combination constituted both a *de facto* merger and a mere continuation of Studebaker. McGraw then succeeded to the liabilities of Studebaker-Worthington, and Cooper succeeded to the liabilities of McGraw.

The trial court also denied McGraw/Cooper summary judgment on all but one of South Bend's claims.[1] In its denial, the court held that South Bend had brought all of its claims within the six-year statute of limitation for harm to property found at Ind. Code § 34-11-2-7.

The court also declared that South Bend's ELA claim was timely because South Bend filed it less than six years after the ELA statute became effective on February 28, 1998. The court reasoned that "no cause of action accrued on behalf of South Bend prior to that date. To find otherwise would be to preclude claims under statutes not yet enacted." (Id. at 3225-26.) The court further held that South Bend had authority to file an ELA claim because it is a "person" as that term is used in the ELA statute, Ind. Code § 13-30-9-2.

---

[1] The court granted McGraw/Cooper summary judgment only on the illegal dumping claim because South Bend did not own the land when the illegal dumping occurred.

5

Cooper appealed, and the Court of Appeals reversed, holding that the six-year statute of limitation for property injuries barred all of South Bend's claims. Cooper Indus., LLC v. City of South Bend, 863 N.E.2d 1253 (Ind. Ct. App. 2007), vacated. We granted transfer.

Summary judgment is appropriate only where no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C).

## I.       South Bend's Common Law Claims

Cooper Industries contends that our statute of limitation, Ind. Code § 34-11-2-7, bars the instant claims because South Bend did not commence its action within six years after it discovered "some ascertainable damage" to the former Studebaker property. (Appellant's Br. at 12-13.) South Bend argues in reply that its common law tort claims are timely as to the property it purchased within six years from the date of commencing the action because a statute of limitation did not accrue until it purchased each parcel. (Appellees' Br. at 28-29.) The trial court agreed with South Bend.

## A.      Common Law Claims

The general six-year statute of limitation applies to South Bend's claims for negligence, trespass, and public and private nuisance.  See Ind. Code § 34-11-2-7(3); cf., Pflanz v. Foster, 888 N.E.2d 756 (Ind. 2008) (applying a ten-year statute of limitation for a contribution action, rather than the six-year statute for property damage, because the statute of limitation did not begin to run until after the claimant was ordered to clean up the property).  The parties dispute both when the action accrued and whether South Bend's claims were timely filed in light of the accrual date.

## B.      Statute of Limitation

Statutes of limitation seek to provide security against stale claims, which in turn promotes judicial efficiency and advances the peace and welfare of society.  "The party pleading a statute of limitation bears the burden of proving the suit was commenced beyond the statutory time allowed."  In re Paternity of K.H., 709 N.E.2d 1033, 1035 (Ind. Ct. App. 1999).  When application of a statute of limitation rests on questions of fact, it is generally an issue for a jury to decide.  Fager v. Hundt, 610 N.E.2d 246 (Ind. 1993).

South Bend argues that its cause of action for damages to the Studebaker property did not accrue for limitation purposes until it became the owner of the property and had a right to commence the action, citing Gray v. Westinghouse Elec. Corp., 624 N.E.2d 49 (Ind. Ct. App. 1993), trans. denied. We cannot agree. Indiana adheres to the rule that "third parties are usually held accountable for the time running against their predecessors in interest." Mack v. Am. Fletcher Nat. Bank and Trust Co., 510 N.E.2d 725, 734 (Ind. Ct. App. 1987).[2] Accepting South Bend's argument would have the practical effect of allowing the mere transfer of property to resurrect the claims of prior landowners and predecessors-in-interests who had actual knowledge of injuries to property. It seems much more likely that the General Assembly had the opposite in mind when enacting Ind. Code § 34-11-2-7.

Under Indiana's discovery rule, a cause of action accrues, and the limitation period begins to run, when a claimant knows or in the exercise of ordinary diligence should have known of the injury. Wehling v. Citizens Nat'l Bank, 586 N.E.2d 840 (Ind. 1992). The determination of when a cause of action accrues is generally a question of law. Barnes v. A.H. Robins Co., 476 N.E.2d 84 (Ind. 1985). For an action to accrue, it is not necessary that the full extent of the damage be known or even ascertainable, but only that some ascertainable damage has occurred. Pflanz, 888 N.E.2d at 759 (quoting Doe v. United Methodist Church, 673 N.E.2d 839, 842 (Ind. Ct. App. 1996)). In addressing a recent claim for contribution based on an obligation to clean up an alleged hazardous use of real property, this Court declared the "notion that the statute of

---

[2] This has been our rule for some time. See Kennedy v. Warnica, 136 Ind. 161, 36 N.E. 22 (1894); Hildebrand v. Kinney, 172 Ind. 447, 87 N.E. 832 (1909); 18 Elizabeth Williams, Ind. L. Encyc. Limitation of Actions § 8 (Joseph T. Latronica, et al. eds., 2003).

limitation begins to run when all the elements of a cause of action can be shown is part of how we determine when a cause accrues." Id. at 758.

Between late 1986 and March 1997, South Bend solicited and acquired numerous environmental reports analyzing hundreds of soil and groundwater samples throughout the relevant area. These reports revealed the contamination that led to this litigation. Furthermore, South Bend hired multiple environmental consultants to explain the reports and legal counsel to analyze its rights, and South Bend acknowledges that it was aware of its consultants' conclusions. South Bend summarized its environmental knowledge, reciting every main premise of this action, in an internal memorandum on October 10, 1995. Based on these facts, Cooper's theory is that South Bend knew of the contamination "for well over ten years" before commencing the action. (Appellant's Br. at 15.)

Cooper urges consideration of the District Court's reasoning in McFarland Foods Corp. v. Chevron USA, Inc., No. IP991489CHG, 2001 WL 238084, at *4 (S.D. Ind. Jan. 5, 2001). There, the court held that a single report demonstrating environmental contamination was sufficient to cause the plaintiff landowner's claims to accrue. (Id. at *3-4.) Cooper observes that South Bend possessed significantly more knowledge than the McFarland plaintiff, knowledge acquired purposefully during the late 1980s and early 1990s. (Appellant's Br. at 15-16.) It argues that South Bend's common law claims accrued long before March 1997, that is, more than six years before they were filed. We conclude this is largely correct, representing ordinary Indiana practice as regards the common law claims filed by South Bend.

9

## II.       South Bend May Proceed With Its ELA Claim.

In 1997, the General Assembly enacted a statute providing for an "environmental legal action" to "recover reasonable costs of a removal or remedial action" involving hazardous substances or petroleum.  Ind. Code § 13-30-9-2.

The parties join two issues pertinent to the ELA claim.  First, for purposes of accrual and the statute of limitation, is ELA largely a consolidation of existing rights to sue, such that the statute might have begun to run decades ago, or is it a new cause of action for which the statute of limitation could not start to run until its enactment?  Second, is South Bend a party who can file an action under ELA?

### A.       The ELA is a "Brownfields" Claim New in 1998.

The ELA is part of the "Brownfield Revitalization Zone Tax Abatement – Environmental Revolving Loan Program" bill, enacted in 1997 to become effective February 28, 1998.  P.L. 59-1997, 1997 Ind. Acts 1789 ("1997 Act").  The bill's overall purpose was the rescue and redevelopment of "brownfields," which the legislation defined as:

> an industrial or a commercial parcel of real estate:
>   (1) that:
>       (A) is abandoned or inactive; or
>       (B) may not be operated at its appropriate use; and
>   (2) on which expansion or redevelopment is complicated;

10

because of the actual or perceived presence of a hazardous substance or petroleum released into the surface or subsurface soil or groundwater that poses a risk to human health and the environment.

1997 Act § 3.

Section 23 of the 1997 Act did not amend any existing parts of the Code, but rather added to the Code an entirely new chapter (consisting of eight entirely new sections). See Ind. Code § 13-30-9-1, *et seq.* (the "ELA Chapter"). To be sure, the ELA chapter overlaps in some ways with enactments such as Indiana's Underground Storage Tank Act – Ind. Code § 13-23-13-8, the Petroleum Release statute – Ind. Code § 13-24-1-4(b), the catch-all environmental statute – Ind. Code § 13-30-1-1,[3] and the federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) – 42 U.S.C. § 9601 *et seq.* (2009). Still, there are certain circumstances under which only the ELA would provide a cause of action.

---

[3] Ind Code § 13-30-1-1 states:
Sec. 1. Under this chapter:

(1) the attorney general;
(2) a state, city, town, county, or local agency or officer vested with the authority to seek judicial relief;
(3) a citizen of Indiana; or
(4) a corporation, a limited liability company, a partnership, or an association maintaining an office in Indiana;

may bring an action for declaratory and equitable relief in the name of the state of Indiana against an individual, a partnership, a copartnership, a firm, a company, a corporation, a limited liability company, an association, a joint stock company, a trust, an estate, a state agency or an officer of the state, a city, a town, a county, a local governmental unit, an agency, or an official of a city, a town, a county, a local governmental unit, or an agency, or any other legal entity or their legal representative, agent, or assigns for the protection of the environment of Indiana from significant pollution, impairment, or destruction.

In addition to the ELA Chapter, the 1997 Act included several provisions adding to and amending the Indiana Code to further redevelopment. These provisions created certain tax abatements (§ 1 of the Act), supplemented an existing voluntary remediation plan scheme (§§ 17 through 22 of the Act), implemented a revolving loan fund program (§ 29 of the Act; Ind. Code § 13-19-5-2), and directed IDEM to develop procedures and a brownfield redevelopment work group (§§ 27-28 of the Act). This legislative effort to address brownfields included a set of policies and programs designed to encourage their remediation, partly by amending existing code and partly by adding new sections. The fact that a cause of action is embedded in a comprehensive bill that adds new material as well as amends existing statutes does not necessarily make it an amendment rather than the creation of a new cause of action.

Section 6 of the 1997 Act defined what the legislature meant by "Environmental Legal Action:" "…any legal action brought to recover reasonable costs associated with a removal or remedial action involving a hazardous substance or petroleum released into the surface or subsurface soil or groundwater that poses a risk to human health and the environment." Ind. Code § 13-11-2-70.3. Cooper contends that this is a redundancy, that it merely restates all existing causes of action. Certainly there are claims available to plaintiffs apart from the ELA in cases similar to South Bend's, but together they do not exhaust the meaning given to an environmental legal action under the 1997 Act. For instance, South Bend points out that a proportionately small amount of its cleanup costs have been related to underground storage tanks or petroleum, so a correspondingly low portion of the recoverable costs would have been available under either the USTA or the petroleum release statute. Moreover, the City's

12

remediation efforts have been voluntary, so as to exclude a contribution claim for compelled remedial action under contribution provisions of the USTA and CERCLA.

In the course of considering the legislation at issue, the General Assembly made various changes to the bill as introduced that support South Bend's characterization of the ELA as creating a new action. For instance, legislators added a new § 1 to the ELA Chapter as introduced describing the general application, saying the ELA "applies to actions brought by the state or a private person," but does not apply to certain actions brought by the state in more extreme environmental contamination cases: where the site is listed on the National Priorities List, scores at least 25 on Indiana's solid waste management scoring model, or is deemed by the IDEM commissioner to be an imminent threat to human health or the environment. 1997 Act § 23. In this context, we conclude the legislature contemplated ELA as creating a new cause of action.

The legislature altered § 2 of the ELA Chapter to clarify the nature of the release of a hazardous substance or petroleum and to place a reasonableness standard on cost recovery. Id. It changed § 3 of the ELA Chapter to narrow one factor a court must consider in evaluating the environmental risks posed by the activity in question by weighing the use of the site at the time of the release against the cost effectiveness of addressing the risks imposed. Id. Furthermore, the General Assembly inserted language providing that a contract allocating responsibility between parties controls despite the ELA. Id. (this language appears in Ind. Code § 13-30-9-3(b)).

13

Most useful on the question whether the ELA is a new cause of action is § 6 of the ELA Chapter, also added by the General Assembly to the bill as introduced. Section 6 states the same proposition in two clear ways. First, it provides that an action to recover costs related to a release from an underground storage tank may be brought under the ELA or the USTA. I.C. § 13-30-9-6. It then reiterates this concept: "A person may not bring the action under both this chapter and IC 13-23-13-8," (the USTA). Id. Requiring litigants to choose between ELA and USTA (which unquestionably creates a cause) indicates the General Assembly clearly intended to create a new and separate cause of action. If the ELA was intended to clarify and narrow such claims as those under the USTA, there would be no reason to require a litigant to choose.

Cooper also contends that the language "the action" means there can only be one action under both chapters of the code and that "the action" actually existed before the legislature enacted the ELA. (Appellant's Reply Br. at 6.) Again, reading the ELA in such a way would render the alternative ELA claim in underground storage tank cases meaningless. In fact, the definite article in the clause "…may bring the action under…" refers to the particular action in the previous clause: "In an action to recover costs associated with a release from an underground storage tank…." Ind. Code § 13-30-9-6. This clause does not refer to an action brought under the USTA but to an action brought based on facts that would also produce a claim under the USTA. In so addressing this contingency, the General Assembly signaled it did not intend to grant claimants two bites at the apple.

Two final changes made during the General Assembly's deliberations added sections to

14

the ELA Chapter: (1) clarifying that a covenant not to sue under Ind. Code § 13-25-5-18 would exempt a party from suit as a result of the ELA and (2) excluding the ELA from affecting any litigation filed before its effective date. 1997 Act § 23 (enacting Ind. Code § 13-30-9-7 and -8. This provision about covenants not to sue as not being affected by the ELA Chapter further indicates legislative intent to create a new cause of action, for to read the ELA in any other way would not require such language, and, like § 6 of ELA, to read it as including existing claims would render it meaningless. Similarly, stating that the ELA "may not be construed to affect any litigation" filed before its effective date is in line with such an interpretation, particularly in light of a situation in which the ELA would provide a more favorable alternative action to a plaintiff after filing its suit.

## B. A City can be a Plaintiff under ELA.

Cooper Industries contends that South Bend cannot bring an ELA claim because South Bend is not "the state or a private person." (Appellant's Br. at 43-44.) South Bend argues that it is a "person" as that term is used in the section authorizing an ELA claim. (Appellees' Br. at 35-36.) The trial court agreed with South Bend.

This debate focuses on the first two sections of Ind. Code § 13-30-9. Standing in juxtaposition, they do provide something of a conundrum. When South Bend filed its case, § 1 of the ELA Chapter began by saying: "This chapter applies to actions brought by the state or a

15

private person."[4]  By contrast, § 2 said:  "A person may bring an environmental legal action…."[5]

For most purposes of Indiana's environmental laws, the Code defines "person" very comprehensively, certainly in a way that includes South Bend:  "'Person'… means… a city, … a town,… political subdivision,… or any other legal entity."  Ind. Code § 13-11-2-158(a).  It does not define "private person."[6]

When courts set out to construe a statute, the goal is to determine and give effect to the intent of the legislature.  Sales v. State, 723 N.E.2d 416 (Ind. 2000).  The first place courts look for evidence is the language of the statute itself, and courts strive to give the words their plain and ordinary meaning.  We examine the statute as a whole and try to avoid excessive reliance on a strict literal meaning or the selective reading of individual words.  We presume the legislature intended the language used in the statute to be applied logically, consistent with the statute's underlying policy and goals, and not in a manner that would bring about an unjust or absurd result.  Prewitt v. State, 878 N.E.2d 184 (Ind. 2007); Sales, 723 N.E.2d at 420.

We look to the underlying purpose of these provisions and to similar Code sections for guidance.  First, it is clear from the plain language of Ind. Code ch. 13-30-9 that the legislature enacted the ELA statute to shift the financial burden of environmental remediation to the parties responsible for creating contaminations.  In effect, this scheme creates an incentive for potential

---

[4] Ind. Code Ann. § 13-30-9-1 (West 1998), amended by 2007 Ind. Acts 221 § 22.

[5] Ind. Code § 13-30-9-2 (1998), *amended by* 2007 Ind. Acts 221 § 23.

[6] The General Assembly subsequently amended the ELA Chapter in 2007 by deleting the word "private" from § 1.  2007 Ind. Acts 3784.

16

buyers of contaminated land who might be deterred by the substantial costs to clean up the land, thus preventing not only the cleanup but also redevelopment and economic renewal.

The General Assembly enacted other incentives for potential brownfield redevelopers at the same time that it enacted ELA.[7] One of those, Ind. Code ch. 13-19-5, creates the Environmental Remediation Revolving Loan Program, and it explicitly contemplates that cities and other local government entities will be major actors in brownfield remediation and redevelopment. Indiana Code § 13-19-5-1 states the purpose of the Program:

> The environmental remediation revolving loan program is established to assist in the remediation of brownfields to encourage the rehabilitation, redevelopment, and reuse of real property by political subdivisions by providing loans or other financial assistance to political subdivisions to conduct any of the following activities:
> (1) Identification and acquisition of brownfields... as suitable candidates for redevelopment following the completion of remediation activities.
> (2) Environmental assessment of identified brownfields....
> (3) Remediation activities conducted on brownfields.
> (4) The clearance of real property… in connection with remediation activities.
> (5) Other activities necessary or convenient to complete remediation activities on brownfields.

Ind. Code § 13-19-5-1 (1999 suppl.), *amended by* 2007 Ind. Acts 221 § 7.

If, as Cooper contends, cities like South Bend cannot bring ELA claims, it would mean that most nearly anyone but cities could purchase and rehabilitate contaminated land and consequently seek to recover remediation costs from the original contaminator. Cities, by

---

[7] All of this legislation was passed as P.L. 59-1997. See 1997 Ind. Acts 1789.

contrast, would have to act solely at local taxpayer expense (though they could borrow money from the state to finance purchases and remediation). We cannot think of a reason why the 1997 brownfields scheme would have been crafted with this result in mind.

In light of the overall objective of the 1997 bill and the apparent purpose of the ELA Chapter, we conclude that the term "private person" in Ind. Code § 13-30-9-1 should not be read any narrower than the more definite and generally applicable definition found in Ind. Code § 13-11-2-158(a). The trial court correctly held that South Bend could pursue an ELA claim.

## C. Statute of Limitation Runs from ELA's Enactment.

"A statute of limitation does not begin to run against a cause of action before that cause of action exists, *i.e.*, before a judicial remedy is available to the plaintiff." Martin v. Richey, 711 N.E.2d 1273, 1284 n.12 (Ind. 1999). The substance of a cause of action, rather than its form, determines the applicability of the statute of limitation. Shideler v. Dwyer, 275 Ind. 270, 417 N.E.2d 281 (1981).

Cooper asserts that "South Bend had several ways to sue exactly the same parties for the same contamination under the same (or more stringent) standards long before the ELA amendments." (Appellant's Br. at 21). In particular, Cooper cites Indiana's Underground Storage Tank Act, Ind. Code § 13-23-13-8; the Petroleum Release Statute, Ind. Code § 13-24-1-

18

4(b); the catch-all environmental statute, Ind. Code § 13-30-1-1; and the federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.* (Id.) If the ELA simply amends, for clarification or other purposes, pre-existing environmental claims, any change would apply strictly on a prospective basis. *Cf.* Bourbon Mini-Mart v. Gast Fuel and Serv., Inc., 783 N.E.2d 253, 262 (Ind. 2003) (because an amendment to the USTA expanded both "the class of corrective action for which owners and operators could seek recovery," and "the class of third persons from whom recovery could be sought," the statute as amended should be applied retroactively). On the other hand, if the ELA creates an entirely new action, no cause of action could have existed until its effective date. ELA seems to fall somewhere in the middle.

As South Bend points out, the USTA and the Petroleum statutes provide only a right of contribution, whereas the ELA does not so limit seeking cost recovery from another party. See Taylor Farms LLC v. Viacom, 234 F.Supp.2d 950, 962 (S.D. Ind. 2002). Furthermore, each of these are limited by the type of damage done. As such, the limitation found in the ELA's § 6 would only have a narrowing effect in those cases involving sufficient facts to support a claim under the USTA. If such facts existed, the plaintiff would have to choose between the ELA and the USTA. As to Ind. Code § 13-30-1-1, it allows declaratory and equitable relief only, requires a citizen suit notice of six months, and prohibits seeking relief when IDEM is also seeking declaratory relief. (Appellees' Br. at 33). Finally, CERCLA's § 107(a) would require South Bend to prove it was an innocent landowner, while the ELA explicitly permits recovery without regard to the plaintiff's part in causation of the damage.

19

Cooper argues that the "substance of a cause of action, rather than the form, determines the applicability of the statute of limitations," meaning South Bend's claim would accrue when a substantively similar claim would accrue. (Appellant's Br. 20-21, quoting Rice v. Strunk, 632 N.E.2d 1151, 1153 (Ind. Ct. App. 1994), aff'd, 670 N.E.2d 1280 (Ind. 1996), also citing King v. Terry, 805 N.E.2d 397 (Ind. Ct. App. 2004).) For instance, Cooper cites both Shideler v. Dwyer and Rice, in which the plaintiffs had malpractice claims but crafted their complaints in a way to describe claims carrying a longer statute of limitation than the more obvious claim of malpractice. The courts in both cases found that, in fact, the underlying claims were actually for malpractice, and the two-year limitation for malpractice actions should apply. We think the case law Cooper cites on this point addresses the question of how parties characterize facts in their pleadings, not with a change in the underlying law.

Here, if any similar spin has occurred on South Bend's part, it has a limited effect, for at least some of South Bend's claims could not have been brought before February 28, 1998. If the reverse were true and South Bend could have brought the substance of its claims before the end of an applicable statute of limitation but did not, the Shideler rule might bar the City's recovery. In this case, however, South Bend did not have a complete cause of action until the ELA became effective. Therefore, the statute of limitation could not have begun to accrue until that date.

Cooper further asserts that the statute of limitation should have run against South Bend in accord with standard discovery rule principles – when it knew or should have known of the injury. (Appellant's Br. at 13-17.) This misses a broader point about applying statutes of

20

limitation: a statute does not run until a cause of action is complete. The discovery rule may tell us when there was sufficient knowledge about facts, but it does not apply at all to the completion of the underlying law to a cause of action, except to the extent that the law depends on the claim being factually complete. Indiana courts have held consistently that the discovery of a legal theory will not serve as the accrual date, but not that a cause of action can accrue before the law provided for such kind of claim.[8]

Cooper claims that under this logic a claim could be brought based on facts known for a hundred years. Such a claim still must be brought, however, within the applicable statute of limitation from the point of a new cause of action's effective date. In other words, any opening of the floodgates would have a time limit. That time for the ELA passed either on February 28, 2004 or February 28, 2008, depending on which statute of limitation applies. Parties who newly discover ancient contamination and seek to recover costs will be in the same position under the ELA as they would be under the USTA: the statute of limitation will begin to run on the earlier date of actual discovery or when a reasonable person would discover the facts.

Though the parties join in debate over whether South Bend has agreed that the property damage statute of limitation applies in this case, we will adopt six years as the applicable time

---

[8] In <u>Commercial Logistics Corp. v. ACF Indus., Inc.</u>, No. 4:04-cv-00074-SEB-WGH (S.D. Ind., filed July 18, 2006), Judge Barker held that an ELA cause accrued before enactment, on the theory that the ELA covers acts occurring before its enactment. We conclude the new nature of the ELA claim warrants setting accrual no earlier than the date of enactment.

period.[9] Six years from the accrual date was February 28, 2004. Because South Bend filed this action March 19, 2003, it filed within even the shortest arguable limitation. Because we understand the ELA as addressing the issue of "brownfields," that the legislature did not intend to bar cities from bringing these actions, and that the statute of limitation did not run until the cause existed, we hold that South Bend may proceed with its ELA claims.

### III.      Does Cooper Hold the Corporate Liabilities for Surviving Claims?

Both parties moved for summary judgment on whether Cooper is the corporate successor of Studebaker with regard to the environmental liabilities involved in this case. Cooper contends that the liabilities did not pass from Studebaker to Studebaker-Worthington in the 1967 asset sale and therefore did not end up with Cooper. (Appellant's Br. at 23.) Cooper's theory is that asset purchases do not transfer liability, so the liabilities stayed with Studebaker until Studebaker terminated its corporate existence, at which point the liabilities expired. (Appellant's Br. at 24, 30-31; Appellant's Reply Br. at 13-14.) South Bend argues that the liabilities were transferred to Studebaker-Worthington in the 1967 sale, and, in any event, the situation merits application of either the *de facto* merger or the "mere continuation" doctrines. (Appellees' Br. at 10-11.)

---

[9] The parties disagree over whether South Bend conceded the six-year property damage or the ten-year "catch-all" statute of limitation applies at trial. Because we find South Bend's ELA claim would survive under either proposed time period, we do not address the question of the City's concession but instead limit our analysis to the accrual of the statute of limitation.

22

The trial court held that Studebaker-Worthington expressly assumed the Studebaker environmental liabilities. It also held that the transaction qualifies as a *de facto* merger or as a "mere continuation" of the previous corporate enterprise.

The 1967 asset sale agreement contained a choice-of-law provision: "This Agreement shall be construed in accordance with the laws of the State of New York." (Appellant's App. at 1590.) As a preliminary matter, Cooper argues that the trial court should have applied New York law to interpret the 1967 asset sale agreement and should have applied Delaware law to the *de facto* merger and "mere continuation" questions. (Appellant's Br. at 25.) South Bend replies that neither New York law nor Delaware law applies and furthermore that doing so would not alter the outcome. (Appellees' Br. at 15, 22.) These contentions play out differently as respects the several questions about successor liability.

## A. Express Assumption

Under Indiana law, where a corporation purchases the assets of another, the buyer does not assume the liabilities of the seller. Winkler v. G. Reed & Sons, Inc., 638 N.E.2d 1228 (Ind. 1994). One of the four well-recognized exceptions to this rule is an express or implied agreement to assume liabilities. Id.

The agreement governing the 1967 asset acquisition states the following regarding the transfer of liabilities:

> [A Studebaker-Worthington subsidiary] shall deliver to Studebaker one or more written instruments of assumption… to effect the assumption by [the subsidiary] of all the liabilities and obligations of Studebaker existing at the First Closing except (x) Studebaker's liability in respect of the cash dividends [to certain stockholders], (y) [certain employee stock options] and (z) liabilities and obligations for expenses and taxes incurred by Studebaker in connection with this Agreement and the transactions herein provided for, including Studebaker's dissolution and the distribution of SW Corporation Common Stock and Series A and Series B Preferred Stock to Studebaker's shareholders and liabilities and obligations owing to holders of Studebaker stock in their capacities as such holders (including amounts payable in respect of shares of Studebaker Common Stock, First Preferred Stock and Series A Second Preferred Stock, acquired by Studebaker from dissenting shareholders as provided in clauses (i), (ii) and (iii) above, hereinafter together called the "Dissenting Shares").

(Appellant's App. at 1570.)

The Instrument of Assumption of Liabilities and Obligations, of which the asset sale agreement speaks, provides that:

> [I]n consideration of the premises and in accordance with the provisions of the Agreement, and for good and valuable considerations, the receipt and adequacy of which is hereby acknowledged, [a Studebaker-Worthington subsidiary] assumes and agrees to pay, perform and discharge all obligations, contracts, debts and other liabilities of Old Studebaker as the same exist at the date hereof, of any kind, character or description, whether accrued, absolute, contingent or otherwise, and whether or not reflected or reserved against in the balance sheet, books of account or records of Old Studebaker, except that [the subsidiary] does not assume or agree to pay, perform or discharge any of the obligations referred to in [clauses (x), (y), or (z)].

(Id. at 1533.)

Both agreements demonstrate that the parties intended to transfer all existing liabilities from Studebaker to Studebaker-Worthington except for those listed. Neither party contends that the listed exceptions include the environmental liabilities at issue. The question is thus whether "all the liabilities… existing at the First Closing" and "all… liabilities… as the same exist at the date hereof" include the liability deriving from Studebaker's environmental contaminations at the South Bend plant.

The question is one on which both parties have supplied substantial argument. Because we conclude that the trial court was correct to grant summary judgment on two other grounds detailed next, we pass over whether the trial court was correct in granting judgment on grounds of express assumption.

### B.     *De Facto* **Merger and Mere Continuation**

The trial court's holding that the 1967 transaction constituted a "*de facto* merger" and "mere continuation" appears supportable.

As for choice of law concerning *de facto* merger and "mere continuation," Cooper cites the Indiana Code: "This article does not authorize Indiana to regulate the organization or

internal affairs of a foreign corporation authorized to transact business in Indiana." I.C. § 23-1-49-5(c). Cooper further says Delaware law must control. This provision from our Business Corporations Law may well prevent certain regulatory actions as respects foreign corporations granted certificates of authority to transact business in Indiana. It does not drive the judicial task of discerning the overall effect of corporate transactions on the interests of persons and entities who were not party to the earlier transactions. Our task is to understand what dealings have occurred, not to order new action affecting a corporation's internal affairs. For at least these reasons, Ind. Code § 23-1-49-5(c) does not affect our analysis of *de facto* merger or "mere continuation" nor does the statute require Delaware law to control such discussion.

These two doctrines represent exceptions to the general rule against passing along liabilities in the course of an asset sale are widely accepted in the law of American states, including Indiana, New York, and Delaware.[10] Courts sometimes treat asset transfers as *de facto* mergers where the economic effect of the transaction makes it a merger in all but name. Some pertinent findings might include continuity of the predecessor corporation's business enterprise as to management, location, and business lines; prompt liquidation of the seller corporation; and assumption of the debts of the seller necessary to the ongoing operation of the business. See, e.g., AT & S Transport. LLC v. Odyssey Logistics & Tech. Corp., 22 A.D.3d 750, 803 N.Y.S.2d

---

[10] To be sure, Delaware's version of *de facto* merger is far more restrictive, as Cooper argues. Focused as it is on shareholder rights, Delaware may be something of an outlier on this subject, though obviously a very influential one. See, e.g., Orzeck v. Englehart, 195 A.2d 375, 378 (Del. 1963) (affirming that *de facto* is part of Delaware law, declining to embrace Pennsylvania's more fulsome version of the doctrine, even as respects shareholders).

26

118 (2005); Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455 (3rd Cir. 2006); Beals v. Washington Int'l, Inc., 386 A.2d 1156 (Del. Ch. 1978).

There is only modest contest that the 1967 transaction followed this pattern. Studebaker was founded in South Bend during the mid-1800s. For more than a century Studebaker conducted industrial operations in 109 buildings spread across approximately twenty-five city blocks at its headquarters in South Bend. In 1963, Studebaker began diversifying into other lines of business and stopped manufacturing automobiles in South Bend due to a weakening automotive market. In the fourteen months following the decision to stop manufacturing automobiles in South Bend in December 1963, Studebaker sold its foundry, machine shop and engine plant, stamping plant, final assembly plant, body plant, power house, engineering building, truck plant, and several other buildings. (Appellant's Br. at 4.) Studebaker also set aside a fund in the amount of sixty-four million dollars to provide for anticipated losses on the disposal of the South Bend properties and equipment. (Id.)

Studebaker then consolidated its remaining automotive operations in Hamilton, Ontario, to be conducted through its subsidiary, Studebaker of Canada, Ltd. (Id.) Studebaker allegedly discontinued all automotive manufacturing in Hamilton, Ontario, on March 4, 1966. (Id.) As of 1966, Studebaker consisted of nine operating divisions – none of which allegedly were linked to its automotive past and the properties at issue in this case. (Appellant's Br. at 5.)

27

In 1967, Studebaker entered into negotiations which ultimately resulted in a series of agreements and a plan of reorganization whereby Studebaker and Worthington Corporation combined to form Studebaker-Worthington ("S-W") and two subsidiaries. Studebaker and Worthington Corporation both immediately dissolved after the combination of the two companies.

Studebaker-Worthington expressly assumed Studebaker's liabilities in the 1967 agreements. (Appellant's Br. at 5; Appellees' Br. at 3.) The *Instrument of Assumption of Liabilities and Obligations* provided that Saraband Properties, Incorporated, a subsidiary of S-W, would assume all potential future arising liabilities that were existing at the first closing of the transaction. (Appellant's Br. at 5-6; Appellees' Br. at 3.)

The *Transaction Agreement* provided that Studebaker-Worthington would assume the current obligations of Studebaker naturally associated with the business at the First Closing. (Appellees' Br. at 3.) The 1967 agreements also set aside a fund in the amount of $4 million dollars to address Studebaker's retained liabilities occurring in the normal course of business. (Appellant's Br. at 6.) This "fund" agreement expressly required Studebaker to pay for or provide payment for all Studebaker's liabilities, expenses, and taxes not assumed by S-W.[11] (Appellant's Br. at 6.)

---

[11] The fund agreement covered the items excluded in the note above.

28

Moreover, the Proxy Statement sent to Studebaker shareholders and the 1967 Studebaker and 1969 Studebaker-Worthington annual reports show that the divisions, subsidiaries, and products of Studebaker became the divisions, subsidiaries, and products of S-W. (Appellees' Br. at 4.) The Proxy Statement also establishes that there was a continuity of shareholders between Studebaker and S-W. (Appellees' Br. at 4.) The officers and the employees of Studebaker also became officers and employees of S-W after the reorganization. (Appellees' Br. at 4.)

Studebaker remained legally and financially available to satisfy its remaining liabilities for three years after its dissolution and provided public notice regarding the expiration of any pending claims against it. (Appellant's Br. at 6.) Then, after having fully met its responsibilities, Studebaker ceased to exist. (Appellant's Br. at 6.)

We conclude that these facts suffice to warrant the trial court's finding that the 1967 transaction constituted a *de facto* merger such that Cooper may be held to answer South Bend's claims.

The doctrine of "mere continuation" has a slightly different focus. It asks whether the predecessor corporation should be deemed simply to have re-incarnated itself, largely aside of the business operations. Factors pertinent to this determination include whether there is a continuation of shareholders, directors, and officers into the new entity. See, e.g., Chicago Title Ins. Co. v. Alday-Donaldson Title Co. of Florida, Inc., 832 So.2d 810 (Fla. Dist. Ct. App. 2002);

29

Michowski v. Visi-Trak Worldwide, LLC, 415 F.3d 501 (6th Cir. 2005). Judge Weis helpfully laid out the development of these alternatives as respects claims by third parties. Polius v. Clark Equip. Co., 802 F.2d 75 (3rd Cir. 1986).

In the instant case, as in some we have noted from other jurisdictions, the stockholders, directors, and officers of old Studebaker and the former Worthington Corporation became the respective players in Studebaker-Worthington Corporation. The officers of Studebaker became the officers of Studebaker-Worthington. (1967 Annual Report, Appellant's App. 1828-1859; 1969 Annual Report, Appellant's App. 1891-1916.) The shareholders of the two former corporations between them owned 100% of Studebaker-Worthington. (Appellant's App. 2122.) The proxy statement told these shareholders what they were voting on was a "merger." (Appellant's App. 2815-2827.) After selling the South Bend properties and exiting the automobile business, Studebaker entered negotiations that ultimately culminated in the November 1967 Asset Sale in which Studebaker and Worthington Corporation sold selected assets to Studebaker-Worthington Corporation and two subsidiaries. (Appellant's App. 1567-91.) All of the acquiring entities were Delaware corporations. Id. Studebaker-Worthington did not buy Studebaker's automotive business and never owned the sites at issue here. Rather, S-W bought only the assets of Studebaker's separate collection of nine non-automotive businesses. (See Appellant's App. 1828-59.)

The fact the successor corporation was incorporated in Delaware does not control. While the law of the state of incorporation may determine issues relating to the internal affairs of a corporation, different principles apply where the rights of third parties external to the corporation

30

are at issue.  See, e.g., First Nat'l City Bank v. Banco Para El Comercio Exterior, 462 U.S. 611,

621 (1983), citing Restatement (Second) of Conflict of Laws §301, which provides:

> The rights and liabilities of a corporation with respect to a third person that arise from a  corporate act of a sort that can likewise be done by an individual are determined by the same choice-of-law principles as are applicable to non-corporate parties.

Section 302 provides:

> Issues involving the rights and liabilities of a corporation, other than those dealt with in § 301, are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties… (2)  The local law of the state of incorporation will be applied to determine such issues, except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties, in which event the local law of the other state will be applied.

Restatement (Second) of Conflict of Laws § 302.

This case is a claim about property damage.  The injury occurred in Indiana.  The law of the place of the wrong occurred (*lex loci delicti*) governs.  In disputes such as this, particularly because it involves a third person, the law of the state with the most significant relationship to the dispute – here Indiana – applies.  See, e.g., Chrysler Corp. v. Ford Motor Co., 972 F.Supp. 1097, 1103 (E.D. Mich. 1997) (holding that the law of the state of incorporation is not entitled to preference with respect to successor liability issues rather than under § 302;  instead, the law of the state with the greatest interest, the location of the contaminated property, should prevail over the law of the state of incorporation).  The trial court properly found that the 1967 transaction was a mere continuation of the earlier corporate forms.

31

**Conclusion**

Because we conclude that the statute of limitation has run on all of South Bend's tort claims, we reverse the judgment granted to the City as respects these claims. The trial court was correct that the ELA claim is timely, and that Cooper is the rightful corporate successor of Studebaker. On these points, we affirm the trial court's order and remand for further proceedings on the merits of the ELA claim.

Dickson, Sullivan, Boehm, and Rucker, JJ., concur.