

FILED

May 06 2020, 9:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Curtis T. Hill, Jr.
Attorney General of Indiana

Benjamin M. L. Jones
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Oliver S. Younge
Younge Law Group
Indianapolis, Indiana

Terry Noffsinger
Of Counsel, Kooi Law
Carmel, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Indiana Department of Child Services,

*Appellant-Defendant*,

v.

Justin Morgan,

*Appellee-Plaintiff*.

May 6, 2020

Court of Appeals Case No.
19A-CT-2635

Appeal from the Morgan Circuit Court

The Honorable Matthew G. Hanson, Judge

Trial Court Cause No.
55C01-1805-CT-850

**Brown, Judge.**

[1] The Indiana Department of Child Services ("DCS") appeals the denial of its motion for summary judgment. We reverse.

*Facts and Procedural History*

[2] On June 23, 2011, Justin Morgan and Meghan Price had a son, Brayson. At the end of 2015, Morgan moved to New Mexico because of financial pressure and fear of Price and Price's boyfriend, Steven Ingalls. Morgan made efforts to spend time with Brayson and attempted to obtain custody and parenting time. Morgan did not see Brayson "during much of 2013 or all of 2014 and quite a bit of 2015." Appellant's Appendix Volume II at 71.

[3] Between July 18, 2014, and November 22, 2016, DCS received twelve preliminary reports of physical abuse and/or neglect regarding Brayson through its Child Abuse and Neglect Hotline. DCS screened out three reports due to credibility, relevancy, and/or timeliness issues and screened nine preliminary reports. DCS conducted six assessments which concluded that allegations of physical abuse and/or neglect were unsubstantiated.

[4] On November 23, 2016, Brayson died. On November 25 and 28, 2016, Mooresville Police Detective Chad Richhart interviewed Morgan and his parents who expressed the concerns they had with Price and Ingalls. They also expressed frustration with DCS. On June 23, 2017, the State filed charges against Price and Ingalls related to Brayson's death.

[5] On December 13, 2017, Morgan filed a tort claims notice alleging that DCS knowingly and negligently placed Brayson in a situation that endangered his

life and health and was responsible for his bodily injuries and death. On May 17, 2018, Morgan filed a complaint against DCS and Price for damages for the wrongful death of his son.[1]

[6] On August 16, 2019, DCS filed a motion for summary judgment and argued in part that Morgan's failure to timely file a notice of tort claim precluded him from asserting a wrongful death action. On October 5, 2019, the court denied DCS's motion in a one-page order stating "there are genuine issues of material fact in this case." Appellant's Appendix Volume II at 18. On October 8, 2019, DCS filed a motion to certify the court's order for interlocutory appeal, and the court later granted the motion.

## *Discussion*

[7] We review an order for summary judgment *de novo*, applying the same standard as the trial court. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). The moving party bears the initial burden of making a *prima facie* showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Manley v. Sherer*, 992 N.E.2d 670, 673 (Ind. 2013). Summary judgment is improper if the moving party fails to carry its burden, but if it succeeds, then the nonmoving party must come forward with evidence

---

[1] On July 16, 2019, Morgan filed a motion asking the trial court to "make a preliminary determination of law as to what interest the individual defendant, Meghan Price, has in the proceedings being litigated . . . and enter judgment on the pleadings, dismissing Meghan Price as a party from said proceedings." Appellant's Appendix Volume II at 49. On July 21, 2019, the court granted Morgan's motion and dismissed Price as a party.

establishing the existence of a genuine issue of material fact. *Id.* We construe all factual inferences in favor of the nonmoving party and resolve all doubts as to the existence of a material issue against the moving party. *Id.*

[8] Our review of a summary judgment motion is limited to those materials designated to the trial court. *Mangold ex rel. Mangold v. Ind. Dep't of Natural Res.*, 756 N.E.2d 970, 973 (Ind. 2001). In reviewing a trial court's ruling on a motion for summary judgment, we may affirm on any grounds supported by the Indiana Trial Rule 56 materials. *Catt v. Bd. of Comm'rs of Knox Cty.*, 779 N.E.2d 1, 3 (Ind. 2002). The interpretation of a statute is a legal question that we review *de novo*. *Young v. Hood's Gardens, Inc.*, 24 N.E.3d 421, 424 (Ind. 2015).

[9] DCS argues in part that Morgan's claim is barred because he failed to file a timely notice of tort claim within 270 days of the November 28, 2016 interview. It argues that a person of common knowledge and experience would have been on notice of the possibility that some claim against DCS might exist no later than November 28, 2016. It asserts Morgan knew on November 28, 2016, that Brayson had died in the Price household, DCS had received and assessed multiple reports of abuse or neglect involving Price and/or Ingalls, and DCS had not intervened to protect Brayson from Price and/or Ingalls by removing him.

[10] Morgan argues that only law enforcement and DCS knew the cause of death in November 2016 and that information was deliberately and actively kept secret

until June 23, 2017, when criminal charges were filed. He asserts that he had 270 days from that date to file his notice of tort claim.

[11] The Indiana Tort Claims Act ("ITCA") provides that "a claim against the state is barred unless notice is filed with the attorney general or the state agency involved within two hundred seventy (270) days after the loss occurs." Ind. Code § 34-13-3-6. Loss is defined as "injury to or death of a person or damage to property." Ind. Code § 34-6-2-75(a). A loss occurs for purposes of ITCA "'when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another.'" *Reed v. City of Evansville*, 956 N.E.2d 684, 691 (Ind. Ct. App. 2011) (quoting *Wehling v. Citizens Nat'l Bank*, 586 N.E.2d 840, 843 (Ind. 1992)), *trans. denied*. "The purpose of the notice requirement is to inform state officials with reasonable certainty of the accident or incident and surrounding circumstances and to advise of the injured party's intent to assert a tort claim so that the state may investigate, determine its possible liability, and prepare a defense to the claim." *Ind. Dep't of Transp. v. Shelly & Sands, Inc.*, 756 N.E.2d 1063, 1076 (Ind. Ct. App. 2001), *trans. denied*.

[12] A "cause of action of a tort claim accrues and the statute of limitations begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another." *Wehling*, 586 N.E.2d at 843. The determination of when a cause of action accrues is generally a question of law. *Cooper Indus., LLC v. City of S. Bend*, 899 N.E.2d 1274, 1280 (Ind. 2009). For an action to accrue, it is not

necessary that the full extent of the damage be known or even ascertainable, but that only some ascertainable damage has occurred. *Id.*

[13]    In the November 25, 2016 interview between Detective Richhart and Morgan and his parents, Lee and Debbie, Morgan stated, "I just wish the State of Indiana would have taken this seriously before." DCS Exhibit 3A at 2:08-2:13. Lee stated he was concerned with respect to DCS having reports in three or four different counties, whether communication occurred, and whether that delayed DCS in taking any action or seeing there was a situation requiring action. *Id.* at 4:20-4:50. Morgan and Debbie discussed Brayson's injuries including a broken leg and arm. Debbie stated:

> There was all these little things that happened over time that started from when he was born. And I told my nurse friend, I said, I said at the rate this is going with the stuff going on he is going to die. I felt it in my heart that he was. And I told her that more than once but I didn't know what I could do. I trusted the State of Indiana that was supposedly investigating all this stuff to do something.

*Id.* at 50:27-50:57. Detective Richhart stated that he had a search warrant for Price's phone and Ingalls's phone. He stated that "we don't know why this happened" and that he would not go into detail but he did have some "red flags." *Id.* at 1:11:28-1:11:45. Morgan stated: "When she first called me, it was the day that he passed . . . her first words . . . the first words out of her mouth was I just want to let you know I had nothing to do with this. She said I did all

I could. She said the police said that I did all I could. But that first sentence, the first thing out of her mouth is haunting me." *Id.* at 1:25:56-1:26:43.

[14] In the November 28, 2016 interview, Morgan indicated that Price discussed cremation during the first phone call and Debbie stated that she "wanted it done before we got out here." DCS Exhibit 3B at 7:00-7:07. Detective Richhart stated that he would talk with Price again because there were "some things since all this that have come up that don't sit right with me, that don't make sense to me, but uh, just stuff like this, ya know, talking about cremation, I mean the day of." *Id.* at 8:03-8:19. Lee stated: "It's like it was all planned." *Id.* at 8:19-8:21. Detective Richhart replied, "Right, and that's my concern like if you're wanting this cremation right away, are you trying . . . to hide something." *Id.* at 8:22-8:30. Morgan stated that Price tried to talk him out of seeing Brayson during the second phone call. *Id.* at 8:30-8:37. Detective Richhart stated DCS was "going to go try and take the younger one," and Morgan stated, "Thank God. Thank God." *Id.* at 9:05-9:17. At one point, Lee asked Detective Richhart if he had the impression Price "was going to clam up." *Id.* at 11:10-11:14.

[15] During the interview, the following exchange occurred:

> Debbie: It's amazing how many times she was reported.
>
> Detective Richhart: Right.
>
> Morgan: I tried so hard to protect that boy.
>
> Detective Richhart: Yeah.

Debbie:  It just blows my mind that somebody could be called on that many times.

* * * * *

Detective Richhart:  I don't know DCS's protocols none of that, they're their own separate entity from us.  I don't know why this has never hit our radar.  I've been called out two three 'o clock in the morning on much, much less so I don't know why.  I mean I have six DCS reports from 2014 to current so I don't understand why one of those six hasn't hit our radar as hey maybe this should be looked into.

Morgan:  I wish I knew to call you guys.

Detective Richhart:  No, I mean people do the right thing and they call them and I'm not knocking them.  I'm not . . . I don't want to come across like that.  But uh.

Lee:  Well, it's just interesting the number of calls that have been made to them.

Detective Richhart:  Right.

Lee:  And the different reports that that's not being merged into one document.

Detective Richhart:  Right.  I mean they can . . . pull them all up and there were six of them . . . .  And I don't understand why.  I don't know.  I don't get it.

Lee:  But were each one of them enough that should have called for some action in your . . . .

Detective Richhart:  . . . I think the leg one did in my opinion because . . . there are certain injuries you expect with a kid.  A broke or fractured femur, that's the strongest bone you've got ya know.

Debbie: Well, and when I worked in an emergency room some kid came like that, and that was immediate thought, and they immediately called, because that is just like almost always.

*Id.* at 18:10-20:24. Debbie also stated that Price told three different stories regarding Brayson's broken femur.

[16] Lee asked Detective Richhart if he had seen a report indicating that Ingalls was required to stay away from Brayson, and Detective Richhart indicated he had not seen a report and that DCS could implement a safety plan. Detective Richhart stated he had the information from the cell phones that showed "major red flags." *Id.* at 23:54-23:58. Detective Richhart indicated that Ingalls was going to be interviewed again. Lee stated that it sounded like Ingalls had quite a history with the system, and Detective Richhart agreed. At some point, Detective Richhart stated there was nothing Brayson did that caused this and that the doctors were confident that, even if Brayson somehow hurt himself, he did nothing to cause his death. Morgan responded that Price was a monster.

[17] Morgan stated: "Nothing against you but I hate this state." *Id.* at 42:27-42:30. He also said: "I just hate the fact that they didn't do anything. There were signs everywhere." *Id.* at 42:37-42:42. Detective Richhart stated: "I don't know why . . . DCS never contacted us." *Id.* at 42:47-42:55. Lee stated: "Well they never even followed up with [Morgan] to ask him any questions." *Id.* at 42:58-43:03. Morgan indicated "that's how they miss things" during a discussion of caseloads of DCS workers. *Id.* at 43:42:43:45. Morgan also stated he was going to "get things changed in this state." *Id.* at 44:02-44:05.

[18]     As noted, the Indiana Supreme Court has held that, for an action to accrue, it is not necessary that the full extent of the damage be known or even ascertainable, but only that some ascertainable damage has occurred. *Cooper Indus., LLC*, 899 N.E.2d at 1280. Based upon our review of the interviews, we conclude that Morgan had serious concerns with Price and Ingalls and knew that Brayson had been injured on multiple occasions and ultimately died, and DCS had been informed on multiple occasions and had not removed him from the home. Further, Morgan and his parents expressed concerns about DCS's investigations and inactions. We conclude that a notice of tort claim would have to be filed within 270 days of November 28, 2016, or by August 25, 2017, and that Morgan's December 13, 2017 ITCA notice was untimely.[2] Under these circumstances, we conclude the trial court erred in denying DCS's motion for summary judgment.

_____

[2] To the extent Morgan cites *Garnelis v. Ind. State Dep't of Health*, 806 N.E.2d 365 (Ind. Ct. App. 2004), we note that the plaintiff in that case had been diagnosed as being HIV positive and was informed on September 27, 1991, that the diagnosis was definitive and he was not instructed that he needed to undergo repeat testing. 806 N.E.2d at 366. Several years later, the plaintiff underwent HIV testing in Greece in order to receive treatment and learned that the test results were negative for HIV on July 5, 1999. *Id.* at 367. On appeal from a grant of the defendant's motion for summary judgment, this court reversed and held that September 27, 1991, the date of the erroneous diagnosis, was not the date on which the plaintiff's loss occurred. *Id.* at 371. Rather, the court concluded that the plaintiff "did not know or, in the exercise of ordinary diligence, could not have discovered the alleged negligence and resulting injury until July 5, 1999," when the plaintiff discovered that he was not HIV positive. *Id.* Morgan had serious concerns with Price and Ingalls and knew, on November 28, 2016, that Brayson had been injured on multiple occasions and ultimately died and that DCS had been informed on multiple occasions and had not removed Brayson. We find *Garnelis* distinguishable.

For the foregoing reasons, we reverse the trial court's denial of DCS's motion for summary judgment.[3]

Reversed.

Najam, J., and Kirsch, J., concur.

---

[3] Because we reverse on this basis, we need not address DCS's arguments that it does not have a duty to protect a child from his parent enforceable through a private right of action or that it was not the proximate cause of Brayson's death.