# FOR PUBLICATION



ATTORNEYS FOR APPELLANT:

**DAVID L. SWIDER**
**BRYAN H. BABB**
Bose McKinney & Evans LLP
Indianapolis, Indiana

**PATRICK T. GILLEN**
Naples, Florida

**THOMAS BREJCHA**
**PETER BREEN**
Thomas More Society
Chicago, Illinois

ATTORNEYS FOR APPELLEE:

**NELSON A. NETTLES**
**CYNTHIA E. LASHER**
Norris Choplin Schroeder LLP
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE:

**MICHAEL C. HEALY**
State of Indiana Civil Rights Commission
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| FISHERS ADOLESCENT CATHOLIC ENRICHMENT SOCIETY, INC., | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 93A02-1202-EX-145 |
| | ) | |
| ELIZABETH BRIDGEWATER o/b/o ALYSSA BRIDGEWATER, | ) | |
| | ) | |
| Appellee-Complainant. | ) | |

APPEAL FROM THE FINAL JUDGMENT OF
THE INDIANA CIVIL RIGHTS COMMISSION
The Honorable Robert D. Lange, Administrative Law Judge
No. EDha08100620 & EDrt08110681

**OPINION - FOR PUBLICATION**

**VAIDIK, Judge**

## Case Summary

Fishers Adolescent Catholic Enrichment Society, Inc. ("FACES"), is a private, non-profit organization with religious, educational, and social features.[1] FACES was formed in 2006 to provide enrichment opportunities for homeschooled children. Its founders are Catholic parents and the majority, though not all, of the members are Catholic. When this dispute arose, FACES offered a number of educational courses to its high-school-aged members, none of which related to religion. FACES also sponsored social events. In fall 2008, FACES sponsored a dance, and one FACES parent, Elizabeth Bridgewater, requested special dietary accommodations for her child, Alyssa, who planned to attend. Alyssa suffers from a dietary condition that can cause a life-threatening allergic reaction if she eats certain foods. The Bridgewaters were unhappy with FACES' response to their request and filed an accommodation complaint with the Indiana Civil Rights Commission ("ICRC"). The following month, the family was expelled from FACES. They filed an additional complaint with the ICRC, alleging that FACES had retaliated against them because they filed the accommodation complaint.

FACES moved to dismiss the accommodation and retaliation complaints, arguing that the ICRC did not have jurisdiction over FACES, which it characterized as a religious

---

[1] According to FACES' founders, the term "fishers" was "deliberately worked into the organization's name so as to reflect the idea that Christ was a fisher of men and the members of FACES were engaged in a Christian endeavor." Appellant's Br. p. 10.

organization. An administrative law judge ("ALJ") ultimately ruled that the ICRC had jurisdiction under Indiana's Civil Rights Law ("the civil rights law") because FACES "relates to" education. The same ALJ later ruled on the merits of the Bridgewaters' complaints and concluded that FACES did not commit an unlawful discriminatory practice because it accommodated Alyssa's dietary needs, but did commit an unlawful discriminatory practice by expelling the Bridgewater family after they filed the accommodation complaint. The ALJ awarded the Bridgwaters $5000 in damages and ordered FACES to: (1) cease and desist from retaliating against persons because they filed a complaint with the ICRC; (2) post a link to the ALJ's order on all websites on which they communicated information about the case; and (3) offer reinstatement of the Bridgewater family to full membership, including all benefits. Both parties appealed the order to the ICRC. The order was affirmed in all respects, except the amount of damages was decreased.

Both parties now appeal. The main issues raised on appeal relate to the ICRC's jurisdiction over FACES and the corrective action FACES was ordered to undertake. In addition, the parties challenge the ALJ's conclusions as to accommodation, retaliation, and damages. We conclude that the nature and features of FACES make the organization sufficiently related to education such that the ICRC's jurisdiction is proper, and we uphold the ALJ's conclusions, with one exception. We find the ALJ's order that FACES post its decision on all websites on which they communicated information regarding the

3

case to be unconstitutional compelled speech, and we reverse this portion of the order. We affirm in part and reverse in part.

## Facts and Procedural History

FACES was formed in 2006 by two Catholic mothers, Virginia Zender and Vanessa Alexander. It is a private, non-profit organization incorporated in Indiana since 2007. *See* Appellant's App. p. 43-45. FACES receives charitable funding from organizations such as the United Way and is recognized under section 501(c)(3) of the Internal Revenue Code.

FACES has religious, educational, and social features. According to FACES' founders, the organization was created to provide "a group where teenagers could get together to learn and socialize in an environment consistent with their Catholic faith," Appellant's Br. p. 8, and

> to implement the teaching of the Roman Catholic Church, more specifically: (1) the teaching that parents have primary responsibility for the education of their children; and (2) the teaching that members of the church should demonstrate solidarity and fraternal charity as they endeavor to live their vocation by educating children in their faith and preparing them to serve the common good.

*Id.* at 9. FACES has both Catholic and non-Catholic members.

Around the time of the events in this case, FACES offered courses for its high-school-aged members in subjects such as Microsoft Word and PowerPoint, computer programming, speech, drama, biology, and French. Members had to pay a fee and sign a waiver of liability to enroll in the courses. *See* Appellant's App. p. 78. Once enrolled, FACES members "me[t] once per week for some thirty weeks during the school year" in

4

public spaces such as local libraries and bookstores. *Id.* at 40, 81-82. The weekly meeting would begin at 9:00 a.m. and last until approximately 4:00 p.m. *Id.* at 77. Some weekly meetings would end after 4:00 p.m., when students were given tests at the end of the day. *Id.* The courses offered by FACES were taught by volunteer teachers, and, at other times, by Zender and Alexander. *Id.* at 79. Some of the courses, like French and biology, were taught using textbooks, while others were taught using teacher-generated materials. *Id.* at 67, 79-80. FACES did not offer any religious courses when this dispute arose. FACES did not issue grades, transcripts, or diplomas. In addition to providing educational courses, FACES sponsored social activities.

The Bridgewater family joined FACES in 2007. Elizabeth Bridgewater and her daughter Alyssa were particularly involved in the group. In fall 2008, FACES planned to host an "All Souls' Masquerade Ball" to coincide with the Catholic feast day of All Souls' Day. Elizabeth was assigned the task of planning the ball, which was to be held at the Ritz Charles in Carmel. Elizabeth frequently communicated with Ritz Charles staff to plan the event, including the menu. Because Elizabeth's daughter Alyssa suffers from eosinophilic esophagitis ("EE"), a condition that requires Alyssa to adhere to a strict diet to avoid a life-threatening allergic reaction in which her ability to breathe and swallow is impaired or even stopped altogether, Elizabeth told Ritz Charles staff that she and Alyssa would need to eat different meals from the other attendees.[2] When Elizabeth told Zender

---

[2] Eosinophilic esophagitis causes a type of white blood cell (eosinophil) to build up in the esophagus as a reaction to foods, allergens, or acid reflux. When that happens, the eosinophils can inflame or injure the esophageal tissue. *See* http://www.mayoclinic.org/eosinophilic-esophagitis/ (last visited April 30, 2013). The parties dispute whether Alyssa's condition qualifies as a disability. The

and Alexander of this plan, Alexander told Elizabeth that she would take over the planning duties and told Elizabeth to stop contacting the Ritz Charles.

Months later, when speaking with Alexander about the ball, Elizabeth learned that the menu for the ball included chicken. Elizabeth told Alexander that Alyssa could not eat chicken and would need beef instead. Alexander rejected this idea, telling Elizabeth that the boys attending the ball would be jealous if Alyssa received steak and they did not. Some time later, Elizabeth followed up on the issue in an email to Alexander and Zender, again requesting that Elizabeth be allowed to order steak, and offering to pay the price difference. If steak was offensive, Elizabeth asked if Alyssa could order a hamburger. Alexander and Zender rejected Elizabeth's proposed solutions. Elizabeth responded by asking if the Bridgewaters could supply their own dinner for Alyssa, and, if so, whether they would receive a discount on the ticket price for the ball. Alexander and Zender said that the Bridgewaters could bring Alyssa's meal, but told Elizabeth that there would be no ticket-price adjustment.

The dispute continued. In October 2008, the Bridgewaters wrote to the FACES board—which consisted of Zender, Alexander, and a third woman, Margaret Beard—that Alyssa would be humiliated if her mother were to bring her meal to the ball. The Bridgewaters said that the Ritz Charles was willing to prepare a special meal for Alyssa, and renewed their request that this be allowed. They did not receive a response from the

---

Bridgewaters argue that FACES has waived any challenge to Alyssa's condition by raising the issue for the first time in its reply brief. We agree that this issue was not properly raised before FACES' reply brief. *See* Ind. Appellate Rule 46(C) ("No new issues shall be raised in the reply brief."). Therefore, for purposes of this appeal, we assume that Alyssa has a disability as a matter of law.

board. On October 9, 2008, the Bridgewaters filed a discrimination complaint with the ICRC, alleging that FACES had discriminated against Alyssa by refusing to provide a reasonable accommodation for her medical condition at the ball. FACES responded, stating that reasonable accommodations had been provided and Alyssa had not been prohibited from attending the event.

Ultimately, the Bridgewaters ordered Alyssa a separate meal from the Ritz Charles, which they paid for. Alyssa attended the ball on November 2, 2008, without incident.

Four days after the ball, the Bridgewaters received a letter from FACES telling them that they were being expelled from the organization. The letter gave four reasons for the expulsion: (1) Elizabeth had voiced concerns about a FACES class to a teacher rather than to the FACES board; (2) Elizabeth had, on one occasion, refused to leave a classroom when asked; (3) Alyssa brought a tape recorder to one of her classes; and (4) Elizabeth made contact with the Ritz Charles after Alexander had told her not to do so. *Id.* at 531-32. FACES' decision came as a surprise to the Bridgewaters, who had never before been told of any complaints about their behavior.

Elizabeth responded in writing to the reasons for the family's expulsion. She explained that her discussion with a teacher was not related to instruction, but rather the dispute about Alyssa and the ball. Elizabeth denied having stayed in the classroom after being asked to leave, and she stated that there was no rule prohibiting students from using

7

tape recorders in FACES classes. Finally, she stated that she contacted the Ritz Charles after being instructed not to in order to discuss Alyssa, not on behalf of FACES.

In November 2008, the ICRC issued a notice stating that probable cause existed to believe that FACES had committed an unlawful discriminatory practice. *Id.* at 33-35. The same day, the Bridgwaters amended their complaint to include the allegation that the unlawful discrimination had occurred in education and/or public accommodations because of Alyssa's disability. The Bridgewaters also filed a second complaint with the ICRC, alleging that FACES had unlawfully retaliated against the family by expelling them because they had filed an accommodation complaint with the ICRC. FACES denied that it had retaliated against the Bridgewaters and moved to dismiss the complaints, arguing that the ICRC did not have subject-matter jurisdiction over FACES because it was a religious organization—not an educational one as the Bridgewaters claimed.

A hearing was held before an ALJ for the ICRC. Following the hearing, the ALJ ruled for the Bridgewaters, concluding that the ICRC had jurisdiction over the accommodation complaint. The ALJ explained that the civil rights law prohibited discrimination "relating to" education. And the ALJ concluded that FACES was indeed related to education:

> FACES is a religious-based not[-]for[-]profit corporation recognized as such under section 501(c)(3) of the Internal Revenue Code. FACES was formed by a group of parents of home schooled children and its purpose is to provide educational, spiritual, and social enhancement for those children by providing them with opportunities to interact with other adolescents that are not inherent in the home schooling experience. FACES admits family

8

affiliates who desire a Catholic environment and who pay a modest annual fee. It meets once a week for some thirty weeks during the school year and periodically for limited social engagements, such as the ball out of which this case arose. At the time of its motion, FACES had eleven family affiliates.

FACES is a small organization that has genuinely selective criteria for membership. It does not offer goods, services, or facilities to the general public and, for that reason, is not a public accommodation as that term is defined in the [civil rights law].

[T]here is no provision defining, for purposes of the [civil rights law], what education is. It is clear . . . that "[e]very discriminatory practice **relating to** . . . education . . . shall be considered unlawful unless . . . specifically exempted from this chapter." IC 22-9-1-3(1) (emphasis added).

FACES argues that the [civil rights law] should not be interpreted to apply because to do so would excessively entangle the [civil rights law] with religion, entanglement that would violate both the United States Constitution, U.S. Const., Am. 1, and the Indiana Constitution, Ind. Const., Art. 1, §§ 3 and 4.

As reasonable as that argument is, it has no application to the issues raised in this particular case. There is no reason to believe that an inquiry into whether FACES refused to provide a reasonable accommodation to Alyssa's food allergies would require any consideration of matters at the core of FACES' religious basis.

*Id.* at 116 (formatting altered). In light of the ALJ's ruling that the ICRC had jurisdiction over the complaint, the ICRC consolidated the Bridgewaters' accommodation and retaliation complaints and conducted a two-day hearing on the matters in September 2010.

A year later, the ALJ entered its order with findings of fact and conclusions of law. *Id.* at 9-22. The ALJ found that FACES did not commit an unlawful discriminatory practice, explaining that FACES "did provide a reasonable accommodation for Alyssa

9

[at] the ball. It may not have been the ideal accommodation and it was not the specific accommodation in Elizabeth's most recent request for accommodation, but it was a reasonable accommodation." *Id.* at 16. The ALJ also noted that "what was reasonable for FACES, a tiny organization putting on its very first ball and being operated by volunteers for whom FACES is not their primary occupation" might not have been reasonable for a larger, more established and professional organization. *Id.*

However, the ALJ concluded that FACES did commit an unlawful discriminatory practice when it expelled the Bridgewater family from the organization in retaliation for filing the accommodation complaint, saying, "the decision to expel the Bridgewaters is too close in time to the filing of the complaint to consider it coincidental." *Id.* at 17. The ALJ addressed each of FACES' stated reasons for expelling the family:

> One [reason] involved direct contact with a volunteer teacher, which does violate a FACES policy; however, it is hardly uncommon to contact the person with whom one has an issue. It is unworthy of credence that a violation of this policy would be a motive for expulsion.
>
> The second reason cited was a refusal to leave a class when requested. The e-mail from the teacher [that] Zender solicited reflects that Elizabeth left when the teacher arrived, not that she refused to leave when requested. This, then, [could not] have been a reason for the expulsion.
>
> Another reason cited by FACES for expelling the Bridgewaters is Alyssa's use of a tape recorder. This behavior, like that involved with the first reason, is fairly typical behavior and in this instance, FACES does not cite a rule or a policy it contravened. This reason, too, is unlikely to have caused the expulsion.
>
> The fourth reason cited by FACES – contacting the Ritz after being told not to – does have some validity and would carry more weight if it were not so tied in with the event that led to the filing of the [accommodation] complaint.

10

*Id.* at 17-18 (formatting altered). Finally, the ALJ explained that there could be "no doubt that Alyssa experienced emotional distress as a result of being dismissed from FACES because of the filing of the [accommodation] complaint." *Id.* at 18. The ALJ noted that Alyssa had been professionally treated for psychological conditions and had medication prescribed. *Id.* But the ALJ also noted that not all of Alyssa's stress was attributable to the dismissal: "some of that distress is doubtlessly attributed to how FACES dealt with the food issue at the ball, which has been found to be lawful, and it is probable that some of her distress arose from factors in her life that have nothing to do with FACES." *Id.* The ALJ awarded Alyssa $5000 in damages.

The ALJ ordered FACES to undertake the following corrective action: (1) cease and desist from retaliating against persons because they filed a complaint with the ICRC; (2) post a link to the ALJ's order on all websites on which they communicated information about the case; and (3) offer reinstatement of the Bridgewater family to full membership, including all benefits. *Id.* at 21.

Both parties appealed the order. FACES challenged the ALJ's conclusions regarding jurisdiction, retaliation, and corrective action. The Bridgewaters challenged the ALJ's conclusions regarding accommodation and damages. After additional briefing and argument before the ICRC chairperson and other commission members, the ICRC issued its order, affirming the ALJ's order in all respects, except for the original amount of damages awarded to the Bridgewaters. *Id.* at 23-25. The ICRC reduced the amount of damages to $2500, saying that the previous damage award was "too high." *Id.* at 24.

11

Both parties now appeal. The ICRC appears as Amicus Curiae on behalf of the Bridgewater family.[3]

**Discussion and Decision**

This case requires interpretation of Indiana's civil rights law. The purpose of the civil rights law is set forth in Indiana Code section 22-9-1-2 and provides:

> Sec. 2. (a) It is the public policy of the state to provide all of its citizens equal opportunity for education, employment, access to public conveniences and accommodations . . . and to eliminate segregation or separation based solely on race . . . disability . . . since such segregation is an impediment to equal opportunity. Equal education and employment opportunities and equal access to and use of public accommodations and equal opportunity for acquisition of real property are hereby declared to be civil rights.

Indiana Code section 22-9-1-6 vests the ICRC with the authority to "receive and investigate complaints alleging discriminatory practices." Included in the definition of unlawful discrimination is "every discriminatory practice relating to . . . education . . . ." Ind. Code § 22-9-1-3(1)(4). The civil rights law does not explain what "relates to" education, and the nature of this case, which involves both religion and education, makes this inquiry complicated. What "relates to" education under Indiana's civil rights law is the threshold, first-impression issue disputed by the parties, and the first question facing this Court.[4] And because this case involves religion, First-Amendment principles act as a constitutional "check" on our decision.

---

[3] We held oral argument in this case on March 19, 2013. We thank the parties for their able advocacy.

[4] The parties' briefs focus on the issue of what "relates to" education, and they spend very little time discussing the other jurisdictional basis at issue—whether FACES is a public accommodation. *See*

Where the ICRC has jurisdiction, the civil rights law prohibits retaliation against any person who files a complaint—or is otherwise involved in related proceedings—with the ICRC. Ind. Code § 22-9-1-6(g). The civil rights law's definition of "person" includes one or more individuals, partnerships, associations, organizations, cooperatives, and legal representatives, among others. Ind. Code § 22-9-1-3(a). If the ICRC determines that a person has committed an unlawful discriminatory practice, it shall order that person to "cease and desist from the unlawful discriminatory practice and require[e] the person to take further affirmative action . . . ." Ind. Code § 22-9-1-6(j). The ICRC may order the person who committed unlawful discrimination to pay damages and post a notice of Indiana's public policy concerning civil rights and the person's compliance with that policy, among other actions. *Id.*

After concluding that the ICRC had jurisdiction over the Bridgewaters' complaints and that FACES had committed an unlawful discriminatory practice in its retaliatory expulsion of the Bridgewaters, the ALJ ordered FACES to take corrective action; specifically, to cease and desist from retaliating against persons because they filed a complaint with the ICRC, post a link to the order on any websites on which it communicated information regarding this case, and offer reinstatement to the Bridgewater family. Whether the ICRC can order FACES to do this is the second major question posed in this appeal.

---

Ind. Code § 22-9-1-3(m) ("'Public accommodation' means any establishment that caters or offers its services or facilities or goods to the general public."). The ALJ determined that FACES was not a public accommodation, and we agree. *See* Appellant's App. p. 116. For this reason and because the parties devote the majority of their briefs to the educational argument, we do not address this secondary issue.

13

The remaining issues relate to the ALJ's conclusions about whether FACES committed unlawful discriminatory practices. The Bridgewaters also ask this Court to reinstate the original amount of damages ordered by the ALJ.

When reviewing an administrative decision, we must determine "whether substantial evidence, together with any reasonable inferences that flow from such evidence, support the [agency's] findings and conclusions." *Zeller Elevator Co. v. Slygh*, 796 N.E.2d 1198, 1206 (Ind. Ct. App. 2003) (citing *Walker v. Muscatatuck State Dev. Ctr.*, 694 N.E.2d 258 (Ind. 1998)), *trans. denied*. We do not reweigh the evidence or judge the credibility of witnesses, and we consider only the evidence most favorable to the ICRC's findings. *Id.* (citing *McClain v. Review Bd. of Ind. Dep't of Workforce Dev.*, 693 N.E.2d 1314 (Ind. 1998)). However, if the question before us is primarily a legal question, "we do not grant the same degree of deference to the [agency's] decision, for law is the province of the judiciary and our constitutional system empowers the courts to draw legal conclusions." *Id.* (citing *Walker*, 694 N.E.2d at 266).

## I. Jurisdiction

FACES first challenges the ALJ's conclusion that the ICRC has jurisdiction over FACES because it "relates to" education.[5] Because the civil rights law does not explain what "relates to" education, we must determine how this phrase should be defined.

---

[5] In its brief, FACES set forth an additional argument regarding jurisdiction. It claimed that the employer exclusions found in Indiana Code section 22-9-1-3 should apply to a discriminatory practice "relating to" education, even if it does not involve employment. *See* Appellant's App. p. 33-35. However, at oral argument, FACES abandoned this claim. *See* Oral Arg. Video Tr. 21:00-40. Therefore, we need not address this argument.

FACES also argues that permitting the ICRC to assert its jurisdiction here would constitute religious entanglement and violate the First Amendment.

When courts construe statutes, the goal is to determine and give effect to the legislature's intent. *Cooper Indus., LLC v. City of South Bend*, 899 N.E.2d 1274, 1283 (Ind. 2009). The first place courts look for evidence is the statutory language. *Id.* We examine statutes as a whole and presume the legislature intended the statute's language to be applied logically and consistent with the statute's underlying policy. *Id.* Thus, we can look to the underlying purpose of the provisions and to similar sections within the Indiana Code for guidance. *Id.* at 1284. Another factor to consider when determining legislative intent is the statute's location within the Indiana Code. *Januchowski v. N. Ind. Commuter Transp. Dist.*, 905 N.E.2d 1041, 1045 (Ind. Ct. App. 2009), *trans. denied*.

The ALJ concluded that the "relates to" education requirement was satisfied here. *See* Appellant's App. p. 116. At oral argument, the parties offered different interpretations of this phrase. FACES argued that in order for a group to "relate to" education, it must be a formal institution whose primary purpose is education. Oral Arg. Video Tr. 09:38, 12:30-13:04. FACES argued that its primary purpose was religion, not education. The Bridgewaters, however, argued that determining whether a group "relates to" education should be a case-specific inquiry, guided by a number of factors, one of which might be religion. *Id.* at 53:35-54:12. But there is no easy interpretation due to the nature of this case. We have before us a religious organization founded by Catholic parents to provide enrichment opportunities for their homeschooled children. FACES

15

argues—and we do not question—that religion permeates all of its activities. Nonetheless, the majority of FACES' enrichment opportunities are educational, and secular in substance.

Homeschooling and religion are two areas in which people can largely expect to be free of government regulation, and often they are intertwined. Parents have many reasons for choosing to homeschool their children, but a common reason is a desire to provide moral or religious instruction. In this instance, parents make a conscious choice to place themselves outside state authority as it relates to their child's education. And some parents may, like those here did, opt to supplement their child's homeschooling in a manner consistent with their religious beliefs. We are sensitive to this and wary of intruding upon their freedom to do so. And yet we believe that a group—even a religious one—may take certain steps to place itself within the purview of the ICRC in this state. In determining whether this has occurred, we believe it is necessary to consider the group's nature and educational features; particularly the level of the group's formality and the delivery and substance of the education it provides.

Here, FACES has taken steps to formalize itself. It was incorporated in 2007. It receives charitable funding from organizations such as the United Way and is recognized under section 501(c)(3) of the Internal Revenue Code. It has a board of directors consisting of its founders and a third group member. This formality also extends to the delivery of the education offered. FACES offered courses for its high-school-aged members in subjects such as Microsoft Word and PowerPoint, computer programming,

16

speech, drama, biology, and French. Members had to pay a fee and sign a waiver of liability to enroll in the courses and once enrolled, met weekly for some thirty weeks during the school year in public spaces such as local libraries and bookstores. Classes began at 9:00 a.m. and continued until approximately 4:00 p.m., although some meetings would end after 4:00 p.m. when students were being tested. Courses were taught by volunteer teachers and sometimes by adult members, using textbooks or teacher-generated materials. As to the substance of the education, none of the classes offered when this dispute arose pertained to religion. In light of these facts, we conclude that FACES is sufficiently related to education such that the ICRC's jurisdiction is proper.

This is not to say that FACES is somehow not "religious enough." Nor do we conclude that FACES' religious purpose is secondary to, or any less important than, its educational purpose. We are tasked with giving effect to the plain language of the statute, which prohibits unlawful discrimination in "every discriminatory practice relating to . . . education . . . ." Ind. Code § 22-9-1-3(1)(4). The statute does not include comparative language, and we decline to add it. We must simply determine whether the "relating to" requirement is satisfied. In the case before us, we conclude that it is.[6]

And there is no need to insert a comparative feature into our analysis. The First Amendment functions as a constitutional safeguard in this respect and would preempt any unconstitutional application of Indiana's civil rights law. The United States Supreme

---

[6] FACES argues that our holding will produce an absurd result. It argues that if FACES is "related to" education, then play dates, study groups, and booster clubs, among others, could also be "related to" education. *See* Appellant's App. p. 24. We disagree. By considering the level of formality and the nature of the education involved, we can exclude these examples.

17

Court has held that the First Amendment prohibits governmental interference with religious tenets—matters of faith, doctrine, or government of religious institutions. *See Hosanna-Tabor Evangelical Lutheran Church and Sch. v. Equal Emp't Opportunity Comm'n*, 132 S. Ct. 694 (2012). FACES' main argument with respect to *Hosanna-Tabor* is that its First-Amendment analysis applies to the remedies ordered by the ICRC, and we address that issue later in this opinion. *See infra*, p. 24-29. However, FACES also cites *Hosanna-Tabor* for the proposition that permitting the ICRC to assert its jurisdiction here would constitute religious entanglement and violate the First Amendment. We cannot agree. The ICRC inquired into FACES' accommodation of Alyssa's dietary needs and retaliatory expulsion of the Bridgewater family. There is simply no religious entanglement issue here—there is no evidence that either of these inquiries resulted in governmental interference with the tenets of the Catholic faith.

## II. ALJ Decisions

Having concluded that the ICRC has jurisdiction over this matter, we now consider the ALJ's decisions. The Bridgewaters argue that the ALJ erred both in finding that FACES reasonably accommodated Alyssa at the ball and by reducing the amount of damages, and FACES argues that the ALJ erred in finding that it engaged in unlawful retaliation.

### A. *Disability and Reasonable Accommodation*

FACES does not contend until its reply brief that Alyssa is not disabled as a matter of law, so that argument is waived. Ind. Appellate Rule 46(C) ("No new issues shall be

18

raised in the reply brief."). Therefore, for purposes of this appeal, we assume that Alyssa has a disability as a matter of law.

On the other hand, the Bridgewaters argue that the ALJ erred in finding that Alyssa was reasonably accommodated at the ball. They contend that FACES' suggestion for accommodating Alyssa's dietary restrictions—having Elizabeth bring Alyssa a meal from home—deprived her of the right to be served food prepared by the Ritz Charles like every other child at the event. While Alyssa was able to have a special meal prepared by the Ritz Charles, the Bridgewaters argue that this was still discriminatory because no discount was given for her ticket, meaning that Alyssa had to pay twice for one meal when no one else did. We disagree.

The provided accommodation need only be reasonable and not optimal, *see Kersting v. Wal-Mart*, 250 F.3d 1109, 1116 (7th Cir. 2001), so FACES acted in compliance with the law when it accepted Elizabeth's proposal of bringing a meal from home. While this option may not have been ideal, it was a reasonable accommodation, as it was the best way to ensure the safety of the food for Alyssa. In the end, Elizabeth chose to pursue another course of action, but that does not mean that FACES did not act reasonably in accepting her original proposal for accommodating Alyssa at the event. We therefore find that there is sufficient evidence to support the ALJ's finding that Alyssa was reasonably accommodated.

*B. Retaliation*

19

FACES contends that the ALJ erred in finding that it engaged in unlawful retaliation by expelling the Bridgewaters. In order to succeed on a retaliation claim, a plaintiff must first show a prima facie case of discrimination by a preponderance of the evidence. *Powdertech, Inc. v. Joganic*, 776 N.E.2d 1251, 1262 (Ind. Ct. App. 2002). Then, the burden shifts to the defendant to show a legitimate and nondiscriminatory reason for its action. If the defendant is able to carry that burden, then the plaintiff has the chance to show again by a preponderance of the evidence that the explanation given by the defendant is a pretext. *Id.* Pretext may be demonstrated by showing that the stated reason for action has no basis in fact; that the stated reason was not the actual reason for action although it is based on fact; or that the stated reason is insufficient to warrant the action taken by the defendant. *See Dale v. J.G. Bowers, Inc.*, 709 N.E.2d 366, 369 (Ind. Ct. App. 1999). Additionally, proximity in time between the filing of a complaint and the retaliatory action may be considered evidence that the stated reason for the defendant's action is a pretext. *See Whirlpool Corp. v. Vanderburgh Cnty.-City of Evansville Human Relations Comm'n*, 875 N.E.2d 751, 758 (Ind. Ct. App. 2007).

The ALJ found that the Bridgewaters met their burden of making a prima facie case of discrimination. Indiana Code section 22-9-1-6(g) prohibits "any person from discharging, expelling, or otherwise discriminating against any other person because the person filed a complaint . . . ." By showing that they were expelled by FACES only twenty-two days after FACES received notice of the original accommodation complaint, Appellant's App. p. 20, the ALJ determined that the Bridgewaters met this initial burden.

20

FACES gave four reasons for its decision to expel the Bridgewaters: (1) Elizabeth had voiced concerns about a FACES class to a teacher rather than to the FACES board; (2) Elizabeth had, on one occasion, refused to leave a classroom when asked; (3) Alyssa brought a tape recorder to one of her classes; and (4) Elizabeth made contact with the Ritz Charles after Alexander had told her not to do so. *Id.* at 16. Elizabeth responded in writing, explaining each of the actions.

In its decision that FACES engaged in retaliation by expelling the Bridgewaters, the ALJ found that none of the four reasons given by FACES for the expulsion were likely to be the true motive for its action. *Id.* at 17-18. While the ALJ found that having direct contact with a volunteer teacher is against FACES policy, it was "unworthy of credence that a violation of this policy would be a motive for expulsion." *Id.* at 17. The ALJ also found that the evidence showed that Elizabeth did leave the classroom when the teacher arrived on the instance in question and there is no FACES rule or policy that prohibits tape recording a class. *Id.* at 17-18. Finally, the ALJ did find that contacting the Ritz Charles after being told not to might carry some weight in this decision if it were not so tied in to the event that led to the actual filing of the original complaint. *Id.* at 18. Therefore, the ALJ found that none of the reasons cited by FACES were sufficient to warrant expulsion of the Bridgewaters, and the Bridgewaters had met their burden of showing that the reasons stated by FACES were pretexts for unlawful retaliation.

FACES, however, contends that these findings by the ALJ are erroneous, arguing that the ALJ focused solely on the temporal proximity between the filing of the complaint

21

and the expulsion of the Bridgewaters as the basis for the ALJ's conclusion. Appellant's Br. p. 54. FACES also argues that the ALJ disregarded both the decisions made by the mothers who ran the group as not "good enough," and Elizabeth's "meddling" in the arrangements for the ball when coming to its decision.

FACES' argument is simply a request that we reweigh the evidence, which we may not do. On appeal, we are to determine "whether substantial evidence, together with any reasonable inferences that flow from such evidence, support the [agency's] findings and conclusions." *Zeller Elevator Co.*, 796 N.E.2d at 1206. We are not to reweigh the evidence, and we consider only the evidence most favorable to the ICRC's findings. Viewing the evidence in this light, we find that there is sufficient evidence here to support the ALJ's findings.

### *C. Damages*

The Bridgewaters contend that the ICRC erred in reducing the amount of damages awarded to Alyssa. The civil rights law provides that, as a remedy for discriminatory behavior, the Commission may require a person to take "further affirmative action as will effectuate the purpose of this chapter, including but not limited to the power: (A) to restore the complainant's losses incurred as a result of discriminatory treatment, as the commission may deem necessary to assure justice . . . ." Ind. Code § 22-9-1-6(k)(A). The statute permits the ICRC to award damages for both economic and emotional distress. *Ind. Civil Rights Comm'n v. Alder*, 714 N.E.2d 632, 637 (Ind. 1999) (citations omitted). Here, the ALJ awarded the Bridgewaters $5000 in damages. On appeal to the

22

ICRC, the commission reduced the damage award to $2500, saying that the previous amount was too high.

As the ALJ explained, Alyssa suffered emotional distress as a result of a combination of factors: being expelled from FACES, how FACES handled the food issue at the ball, and a number of other issues unrelated to FACES. Alyssa suffered no economic losses. Although the Bridgewaters make a very detailed argument that Alyssa suffered severe emotional damage, we do not reweigh the evidence or judge the credibility of witnesses, and we consider only the evidence most favorable to the ICRC's findings. *Zeller Elevator Co.*, 796 N.E.2d at 1206. And contrary to the Bridgewaters' claim, an unexplained change by an agency is not, by definition, arbitrary and capricious. *See Ind. State Bd. of Registration and Educ. for Health Facility Admrs. v. Cummings*, 180 Ind. App. 164, 387 N.E.2d 491 (1979) (agency decision is arbitrary and capricious if it is not supported by adequate written reasons), *reh'g denied*. As the ICRC explained, the previous amount of damages was too high. *See* Appellant's App. p. 24. Given that some of Alyssa's emotional distress was related to FACES, while some was not, and that she suffered no economic damages, we cannot say that this conclusion was error.

FACES also challenges the ALJ's damage award, arguing that any award was inappropriate. But in doing so, they mischaracterize the award as one for "damages for expelling the Bridgewaters . . . ." Appellant's Br. p. 4. The damages resulted from FACES' *retaliatory* expulsion of the Bridgewater family and the emotional distress Alyssa suffered as a result. Had the ALJ awarded damages for a *justified* expulsion of

23

the Bridgewater family—and here, the ALJ rejected the reasons given by FACES—FACES could argue that the damages were inappropriate. Because we affirm the ALJ's conclusion that the Bridgewaters were expelled in retaliation for filing the accommodation complaint, we reject FACES' argument on this issue.

### III. Corrective Action

After finding that FACES unlawfully retaliated against the Bridgewaters for filing an accommodation complaint, the ALJ not only awarded Alyssa damages, but also ordered FACES to take the following corrective action: (1) cease and desist from retaliating against persons because they filed a complaint with the ICRC; (2) post a link to the ALJ's order on all websites on which they communicated information about the case; and (3) offer reinstatement of the Bridgewater family to full membership, including all benefits. FACES does not challenge the "cease and desist" provision,[7] but it does challenge the requirements that it, as a religious organization, be forced to reinstate the Bridgewater family into the organization and post the ICRC's decision on its website under the following three United States Supreme Court cases.

### A. *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*

FACES first argues that the ALJ's decision must be reversed because the ministerial exception within the First Amendment prevents the ICRC from interfering with FACES' religious liberty. In *Hosanna-Tabor Evangelical Lutheran Church and*

---

[7] FACES notes that it would challenge this provision for its lack of detail, but it is choosing not to because it will not resume its operation if it is subject to the jurisdiction of the ICRC. *See* Appellant's Br. p. 57.

24

*School v. Equal Employment Opportunity Commission*, Cheryl Perich worked as a teacher at a school that had as its mission to offer a "Christ-centered education" to students. 132 S. Ct. at 699. Perich was classified as a "called" teacher, meaning that she was "regarded as having been called to [her] vocation by God through a congregation" and had completed certain academic requirements. *Id.* Perich taught kindergarten for four years and fourth grade for one year at Hosanna-Tabor before she was diagnosed with narcolepsy and had to take disability leave. *Id.* at 700. Six months later, Perich still had not returned to work, so the congregation voted to offer her "peaceful release" where the congregation would pay for some of her health insurance premiums and Perich would resign as a called teacher. However, Perich refused to resign, and she was fired about three months later. *Id.*

Perich filed a charge with the Equal Employment Opportunity Commission (EEOC), contending that she had been fired in violation of the Americans with Disabilities Act (ADA). The EEOC then brought suit against Hosanna-Tabor, alleging that Perich was fired in retaliation for threatening to file an ADA lawsuit. *Id.* at 701. Perich sought either reinstatement to her former job or front pay, back pay, compensatory and punitive damages, attorney's fees, and other injunctive relief. *Id.*

Hosanna-Tabor moved for summary judgment on the grounds of the ministerial exception within the First Amendment, and the district court granted it. The district court found that "Hosanna-Tabor treated Perich like a minister and held her out to the world as such long before this litigation began." *Id.* Because of that, the district court found that it

could not inquire into the reasons for Perich's firing. The Court of Appeals for the Sixth Circuit vacated and remanded the decision. It acknowledged the existence of the ministerial exception but found that Perich was not a minister because her duties were identical to those of a lay teacher. *Id.* at 701-02.

The Supreme Court took the case and noted that "the Courts of Appeal have uniformly recognized the existence of a 'ministerial exception,' grounded in the First Amendment, that precludes application of such legislation to claims concerning the employment relationship between a religious institution and its ministers." *Id.* at 705. The Court went on to agree that such a ministerial exception existed and found that it applied to this particular case.

In determining whether the ministerial exception applied, the Court looked at "all the circumstances of [Perich's] employment," *id.* at 707, which generally included the facts that Hosanna-Tabor held Perich out as a minister and Perich held herself out as a minister. Specifically, Hosanna-Tabor issued Perich a "diploma of vocation" that gave her the title "Minister of Religion, Commissioned," Perich completed eight ministerial-related college-level courses, obtained the endorsement of her local Synod district, passed an oral examination, claimed a special housing allowance on her taxes that was only available to individuals earning compensation for ministry, and regarded herself as a minister at Hosanna-Tabor. *Id.* at 707-08. The Court also found that the amount of time that a person spends doing ministerial activities should be a factor when determining if she is a minister, but should not be the sole consideration.

26

After taking into account all of the above factors, the Court determined that Perich was a minister and therefore subject to the ministerial exception of the First Amendment. Therefore, Perich could not bring suit to challenge her termination, as Hosanna-Tabor had the sole authority to "select and control who will minister to the faithful." *Id.* at 709. However, the Court clearly stated that its decision applied only to the type of case before it—"an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her." *Id.* at 710. The Court went on to say, "we hold *only* that the ministerial exception bars such a suit. We express no view on whether the exception bars other types of suit . . . . There will be time enough to address the applicability of the exception to other circumstances if and when they arise." *Id.* (Emphasis added).

In light of this decision, FACES contends that the ICRC's corrective action decision must be reversed, specifically the reinstatement of the Bridgewaters, because it violates the right to religious liberty by interfering with the group's goal of "minister[ing] to one another and striv[ing] to model religious beliefs and virtues." Appellant's Br. p. 61. It argues that this is the precise harm the Supreme Court was trying to prevent in *Hosanna-Tabor*. FACES equates it being able to determine its members with a church having the sole authority to select its ministers, arguing that there is no material difference between the two. We disagree.

The Court took great care to ensure that its holding was narrowly tailored and specific to instances where "an employer is a religious group and the employee is one of the groups' ministers." *Id.* at 699. This is not an employment case, FACES is not a

27

religious employer, and the ICRC is not ordering FACES to make anyone a minister. Therefore, the logic behind the decision in *Hosanna-Tabor* is inapplicable to the present case.

Even if we were to find that the ministerial exception applies here, FACES' actions would still not be immune from ICRC corrective action. FACES expelled the Bridgewaters for reasons completely unrelated to religion. The ministerial exception only prevents outside interference when "[s]uch action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs." *Id.* at 706. Since reinstatement of the Bridgewaters involves no governmental interference with the tenets of the Catholic faith and would not affect the ability of FACES to express its religious beliefs, even if *Hosanna-Tabor* did apply, FACES' argument would still fail.

### B. Boy Scouts of America v. Dale

FACES also argues that the ALJ's corrective-action decision must be reversed due to the right of expressive association guaranteed by the First Amendment. In making this argument, FACES points to *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), for support.

In *Boy Scouts*, James Dale was an assistant scoutmaster of Boy Scout Troop 73 and also the co-president of the Rutgers University Lesbian/Gay Alliance. *Id.* at 644-45. A newspaper published an interview with Dale and a picture identifying him as the co-president of the Lesbian/Gay Alliance, and later that month, his membership with the

Boy Scouts was revoked because the organization "specifically forbid membership to homosexuals." *Id.* at 645. Dale filed suit, alleging that the Boy Scouts had violated New Jersey's public accommodation statute by revoking his membership based on his sexual orientation. The public accommodation statute prevented discrimination on the basis of sexual orientation in places of public accommodation.

The New Jersey Supreme Court held that the Boy Scouts was a place of public accommodation and therefore subject to the public-accommodation law. It then found that the Boy Scouts violated the law when it revoked Dale's membership based on his sexual orientation. *Id.* at 646. The New Jersey Supreme Court also looked at the First Amendment right to association involved in the case and found that the Boy Scouts' "large size, nonselectivity, inclusive rather than exclusive purpose, and practice of inviting or allowing nonmembers to attend meetings, establish that the organization is not sufficiently personal or private to warrant constitutional protection under freedom of intimate association." *Id.* (internal citation omitted). The Court also found that Dale's membership did not affect the Boy Scouts' ability to carry out its various purposes. *Id.* at 647.

The United States Supreme Court, however, disagreed. Focusing on whether the application of the New Jersey public-accommodation law violated the First Amendment, the Supreme Court reversed and held that the Boy Scouts could revoke Dale's membership. Forcing the Boy Scouts to keep Dale as a member, it reasoned, would violate the group's freedom of expressive association. *Id.* at 655-56.

29

To determine if a group is eligible for First Amendment protection for expressive association, it first must be determined if the group actually engages in expressive association. That means that the group "must engage in some form of expression, whether it be public or private." *Id.* at 648. In regards to the Boy Scouts, the Supreme Court looked at its mission statement, Scout Oath, and Scout Law, and determined that it had a clear general mission. To accomplish that mission, "the scoutmasters and assistant scoutmasters inculcate [the youth members] with the Boy Scouts' values—both expressly and by example." *Id.* at 649-50. Seeking to transmit a system of values was determined to be expressive activity, so the Boy Scouts were eligible for First Amendment protection. *Id.* at 650.

After determining that the Boy Scouts engaged in expressive activity, the Supreme Court then undertook an inquiry to determine if "the forced inclusion of Dale as an assistant scoutmaster would significantly affect the Boy Scouts' ability to advocate public or private viewpoints." *Id.* While not everyone would agree that homosexual behavior was antithetical to "morally straight" and "clean" values that the Boy Scouts seek to impart, the organization itself sincerely and consistently held that belief. However, it is only the organization's view that matters, as "it is not the role of the courts to reject a group's expressed values because they disagree with those values or find them internally inconsistent." *Id.* at 651. The Supreme Court held, therefore, that it must give deference to a group's assertions concerning the nature of its expression and what would impair that expression. And because the Boy Scouts believed homosexuality was inconsistent with

30

its values, and Dale's presence as an assistant scoutmaster would interfere with its ability to not promote a view that is contrary to its beliefs, forcing Dale's membership upon the Boy Scouts would be a violation of its freedom of expressive association.

It is important to note, however, that the Supreme Court states in its opinion that the freedom of expressive association is not an absolute freedom. *Id.* at 648. It can be "overridden by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.* (internal quotation and citation omitted); *see also Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987).

FACES contends that this holding makes the ALJ's corrective action of requiring reinstatement of the Bridgewaters unconstitutional because it violates its freedom of expressive association. The first inquiry that must be made in this case is whether FACES engages in expressive association. Expressive association is defined as "associat[ing] with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). FACES notes that its objective was

> to implement the teachings of the Roman Catholic Church, more specifically: (1) the teaching that parents have primary responsibility for the education of their children; and (2) the teaching that members of the church should demonstrate solidarity and fraternal charity as they endeavor to live their vocation by educating children in their faith and preparing them to serve the common good.

Appellant's Br. p. 9. Alexander also stated that her purpose in forming the group was to provide "a group where teenagers could get together to learn and socialize in an

31

environment consistent with their Catholic faith." *Id.* at 8. We find that these purposes fall within the definition of "expressive association," so we next must determine if the Bridgewaters' forced inclusion would interfere with FACES' freedom of expressive association and ability to advocate its desired viewpoints.

FACES argues that it chose to expel the Bridgewaters because Elizabeth's "insubordinate, obstreperous, and mean-spirited" behavior "threatened the group's efforts to achieve the high ideals it was created to foster as well as the very existence of the group." *Id.* at 62. This argument misses the mark. The ALJ found that the Bridgewaters were expelled from FACES in retaliation for filing an accommodation complaint, and we do not reweigh evidence. Therefore, FACES' allegation that it chose to expel the Bridgewaters because Elizabeth's "insubordinate, obstreperous, and mean-spirited" behavior "threatened the group's efforts to achieve the high ideals it was created to foster as well as the very existence of the group," Appellant's Br. p. 62, is without merit. In other words, we cannot go behind the ALJ's factual findings.

Since the ALJ found that the Bridgewaters were expelled for reasons that did not implicate FACES' expressive association, requiring that FACES allow the Bridgewaters back into the group does not violate FACES' right to expressive association and is not unconstitutional.[8]

---

[8] Our colleague would construe the phrase "related to education" more narrowly than we do under these circumstances. Here, he argues that to the extent FACES must readmit Alyssa, she should be allowed to participate in educational activities only—not social activities. Social activities are an important component of a child's education in that they teach respect for others, responsibility, and a sense of community. These lessons are learned not only in the academic setting but also during extracurricular activities such as clubs and social functions like proms or other dances. FACES'

*C. Pacific Gas and Electric Co. v. Public Utilities Commission of California*

Finally, FACES contends that the ALJ's order that it "post a link to these Findings Of Fact, Conclusions Of Law, And Order on all websites on which they have communicated information regarding this case," Appellant's App. p. 21, also violates the First Amendment because it constitutes compelled speech.

In *Pacific Gas and Electric Co. v. Public Utilities Commission of California*, a court order requiring Pacific Gas and Electric to put a newsletter written by a third party, Toward Utility Rate Normalization, in its billing envelope was found to be a violation of Pacific Gas and Electric's First Amendment rights. 475 U.S. 1, 20-21 (1986). The Supreme Court reasoned that Pacific Gas owned the space inside the billing envelope, and requiring it to include a newsletter with the views of a third party was "forced association with potentially hostile views [that] . . . risks forcing [Pacific Gas and Electric] to speak where it would prefer to remain silent." *Id.* at 18.

Because this order compelled speech, it "could be valid if it were a narrowly tailored means of serving a compelling state interest." *Id.* at 19. Applying this strict scrutiny test, the Supreme Court found that although the interest in "fair and effective utility regulation may be compelling," the order was not narrowly tailored. *Id.* Therefore, strict scrutiny was not met and the order was reversed. *Id.* at 21.

Like in *Pacific Gas*, we find that while there is a compelling state interest at stake here—eradicating discrimination—the ALJ's order was not narrowly tailored. The ALJ

education encompasses both academic and social aspects, and therefore we respectfully disagree with our colleague.

ordered that FACES post the decision "on *all websites* on which they have communicated information regarding this case," Appellant's App. p. 21 (emphasis added), which we find to be a more expansive requirement than was necessary to serve the compelling state interest at stake. All websites on which they have communicated information regarding this case could include countless message boards, comments made on news stories, and a vast array of other websites on the internet. By potentially requiring speech from FACES on so many websites, the ALJ's order was not narrowly tailored, and as a result, strict scrutiny is not met. We therefore hold that this portion of the ALJ's order must be reversed.

Affirmed in part and reversed in part.

BRADFORD, J., concurs.

BAILEY, J., concurs in result with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| FISHERS ADOLESCENT CATHOLIC ENRICHMENT SOCIETY, INC., | ) ) ) |
| Appellant-Respondent, | ) ) |
| vs. | ) ) |
| | ) No. 93A02-1202-EX-145 |
| ELIZABETH BRIDGEWATER o/b/o ALYSSA BRIDGEWATER, | ) ) ) |
| Appellee-Complainant. | ) ) |

**BAILEY, Judge, Concurring in Result.**

Elizabeth, having elected to homeschool her daughter, Alyssa, and to associate with FACES for the purposes of educational and social enrichment, nevertheless filed a complaint with the ICRC concerning FACES's alleged violation of Alyssa's civil rights. FACES ended the Bridgewaters' involvement with the group. Concluding that FACES's decision to end Alyssa's membership in the group amounted to retaliation under Indiana's civil rights laws, the ICRC imposed a $2,500 fine upon FACES and enjoined and mandated certain conduct as the end-point of this dispute between a parent and a religiously-oriented private club. The dispute centered on the child's dietary needs at a single social event conducted outside the ordinary timeframe of the club's educational activities.

35

While I agree with the majority that the ICRC could, within its specialized expertise, find that FACES retaliated against Alyssa, and I agree that the ICRC was not within its authority to impose all of the sanctions it did, I would reach these conclusions on significantly narrower grounds than does the majority. I therefore respectfully concur in result.

As the majority notes, the ICRC is an agency with specialized expertise in the matters that come before it. Ind. Civil Rights Comm'n v. Alder, 714 N.E.2d 632, 635-36 (Ind. 1999). Among the ICRC's areas of expertise are questions of civil rights violations and retaliatory conduct in response to the lodging of complaints raising claims of civil rights violations. Such civil rights violations include discrimination in matters "relating to … education." Ind. Code § 22-9-1-3(l). Thus, "[w]e give deference to the expertise of the agency and will not reverse simply because we may have reached a different result than the [ICRC]." Alder, 714 N.E.2d at 635. "However, although an agency's interpretation of a statute is entitled to great weight, courts rather than administrative agencies must resolve questions of statutory construction." Id. at 636. As with statutory construction, subject matter jurisdiction is also a purely legal area that we review de novo upon appeal. M-Plan, Inc. v. Ind. Comprehensive Health Ins. Ass'n, 809 N.E.2d 834, 837 (Ind. 2004).

What matters "relat[e] to … education" is left undefined by the Indiana Civil Rights Law ("ICRL"). Arguing over whether the ICRC had jurisdiction to hear the Bridgewaters' complaint, whether the ICRC had jurisdiction to find that FACES

36

retaliated against the Bridgewaters, and over the scope of the damages to which Alyssa may or may not have been entitled, the parties offer differing interpretations of the statutory language.

Mindful that the ICRL provides that it "shall be construed broadly to effectuate its purpose," I.C. § 22-9-1-2(f), I think this Court can affirm the ICRC's order for damages against FACES without addressing the definitional and jurisdictional questions associated with the disputed statutory language. This is because, in addition to the statutory authority the ICRC possesses to address claims of discrimination, it also has statutory authority to "prevent any person[9] from discharging, expelling, or otherwise discriminating against any other person because the person filed a complaint, testified in any hearing before this commission, or in any way assisted the commission in any matter under its investigation." I.C. § 22-9-1-6(g). That is, the ICRL affords a remedy where one person has filed a complaint, as a result of which another person engages in any form of retaliatory conduct against the complainant. Retaliatory conduct is itself discriminatory under the terms of the statute, then, and a remedy may be afforded to an individual harmed by retaliation even where the underlying claim advanced by the complaint is ultimately found to be without merit.

While there is little or no Indiana case law interpreting subsection 22-9-1-6(g) as it applies to retaliation against members of an educational or social-group environment, as FACES appears to be, I think the majority properly adopts the employment-related

---

[9] A "person" is defined as "one (1) or more individuals … associations, organizations … corporations … cooperatives … and other organized groups of persons." I.C. § 22-9-1-3(a).

standards for evaluating a claim and reviewing a finding of retaliation in this context. I therefore concur with the majority to the extent it concludes that the ICRC properly applied this standard and did not act arbitrarily and capriciously when it found that FACES retaliated against the Bridgewaters as a result of Elizabeth's decision to file a complaint.

I also concur with the majority's decision to the extent it affirms the ICRC's $2500 award for damages resulting from FACES's retaliation. Indeed, because the ICRC found that FACES made reasonable accommodations at the Masquerade Ball for Alyssa's condition, it is clear from the ICRC's order that the only reason damages were awarded was the Commission's finding that FACES's decision to eject Alyssa from the group was pretextual. That order is consistent with the purpose of a separate remedy for retaliation, which is to ensure that those reporting alleged civil rights violations are protected from retaliation for filing a claim; failure to protect an individual for reporting an alleged violation "ultimately undermines a critically important public policy." Frampton v. Cent. Ind. Gas Co., 260 Ind. 249, 253, 297 N.E.2d 425, 428 (1973) (establishing a cause of action for retaliatory discharge in at-will employment relationships where an employee alleged that he was subject to retaliation for exercising his statutory right to seek worker's compensation benefits); see Crawford v. Metro. Gov't of Nashville and Davidson Cnty., Tenn., 555 U.S. 271, 279 (2009) (noting that the "'primary objective'" of the anti-retaliation provisions of Title VII of the Civil Rights Act of 1964 is "'avoid[ing] harm' to employees").

While I concur in these matters, I do so reluctantly. This is so because I do not think that matters "relating to … education," as provided by the ICRL, ought to encompass so broad a range of activities as to include a quintessentially social function like the Masquerade Ball. That is especially so where the group offering the social function is not a formal school, but rather a small organization of volunteers who, for thirty days of the year, work together to provide social and other forms of enrichment for children whom they have decided to homeschool.

In this context, I do not think the reach of the ICRL extends so far as to encompass a social activity like the Masquerade Ball. Put more simply: I do not think, based upon the language of the ICRL, that the ICRC would have properly had subject matter jurisdiction over the Bridgewaters' complaint were it not for FACES's retaliatory conduct.

It seems to me beyond the pale of the ICRL—a statute enacted in the wake of the upheavals of the Civil Rights Movement of the 1960s—to conclude that such social occasions as a Masquerade Ball, held not under the auspices of a formalized school but by a group of volunteers, are events "relating to … education" such that a member of FACES is the victim of a civil rights violation when the group will not accommodate her dietary conditions. Thus, to the extent the ICRC's order would require that FACES readmit Alyssa as a member of the group, I part from the majority and would hold that the order only extends to those activities of FACES that are specifically educational rather than social—that is, FACES's regularly-scheduled events during which academic

39

enrichment activities like language, computer, and other such classes are offered. While I recognize that we are to interpret the ICRL "broadly to effectuate its purpose," I would not conclude that, by the statute's language, its purposes extend so far as to conclude that FACES was required to accommodate Alyssa's dietary needs at the Masquerade Ball.

That said, I do not agree with FACES that it should be entirely exempt from the ICRC's jurisdiction. In Bob Jones Univ. v. United States, 461 U.S. 574 (1983), the United States Supreme Court held that the Internal Revenue Service ("IRS") could revoke the nonprofit tax status of an organization where the IRS's decision advanced a compelling government interest and the decision "substantially outweigh[ed] whatever burden denial of tax benefits" imposed upon the nonprofit organization, even where the organization implemented those policies on religious grounds. Id. at 604. In Bob Jones, the question before the Court was whether the IRS could revoke the university's nonprofit tax status because of its ban on dating and marriage between students of different races, where opposing racial discrimination was recognized as a compelling governmental interest. Id. at 603-605.

Here, FACES has argued that because it is a religiously-oriented organization, it should be entirely free to add or remove members on nearly any basis. I cannot agree; indeed, to take FACES's position would be to hold, in a manner implicitly contrary to the Supreme Court in the Bob Jones case, that government agencies could have no role at all in enforcing various laws because those agencies would simply lack jurisdiction over such religiously-minded institutions. It is disingenuous for an organization like FACES

40

to claim the benefits of tax-exempt status, yet ignore with impunity other laws that have an equally broad-ranged effect.

I also part from the majority in its rationale for reversing that portion of the ICRC's order requiring that FACES post notices on its websites.  I think there is no need to turn to constitutional interpretation to resolve this matter, and we should avoid constitutional declarations where other, non-constitutional means are available to resolve a dispute.  Founds. of East Chicago, Inc. v. City of East Chicago, 927 N.E.2d 900, 905 (Ind. 2010).  The ICRL provides the ICRC with authority to require notice posting:

> [the ICRC] shall cause to be served … an order ... requiring the person to take further affirmative action as will effectuate the purposes of this chapter, including but not limited to the power:
> ***
> (B) to require the posting of notice setting forth the public policy of Indiana concerning civil rights and respondent's compliance with the policy in places of public accommodations.

I.C. § 22-9-1-6(j).  A "public accommodation" is "any establishment that caters or offers its services or facilities or goods to the general public."  I.C. § 22-9-1-3(m).  Because FACES lacks a fixed meeting location or other premises of its own, the ICRC ordered FACES to post the required notice on any website it operates.

Yet the ICRC has not found that FACES is a place of public accommodation; indeed, the ICRC acknowledged that FACES is religiously oriented, limits its membership, and does not hold itself out as open to the general public.   The statute authorizes the ICRC to order posting of a notice "in places of public accommodations." I.C. § 22-9-1-6(j)(B).  FACES has no physical premises, and I would not hold that any

41

website operated by FACES is a place of public accommodation within the meaning of the ICRL, because FACES does not hold itself out as providing services to the general public. See I.C. § 22-9-1-3(m). Because we can properly construe the ICRL to reverse that portion of the order that requires FACES to post notice on its websites, I would not turn to the First Amendment analysis that the majority relies upon to strike the applicable portion of the ICRC's order here.

Though I concur in result, I am less sanguine than the majority about the likelihood that expressive association will not be chilled by the result we reach today. Recognizing the risk that forced inclusion of members could adversely affect the public or private expression of a group's principles, the Supreme Court in Boy Scouts of America v. Dale, 530 U.S. 640 (2000), held that forced inclusion of a homosexual Scout leader infringed upon the Boy Scouts of America's First Amendment right to expressive association when the Boy Scouts had consistently expressed as among its values its opposition to homosexuality.

Here, there was evidence that the Bridgewaters' involvement with FACES resulted in disorder and interference in the activities of the organization due to Elizabeth's and Alyssa's conduct. FACES could have expelled them from membership in the organization, and any order requiring their readmission would have, I think, infringed upon FACES's First Amendment right to expressive association for, as the Court in Dale observed, "'[f]reedom of association … plainly presupposes a freedom not to associate.'" Id. at 648 (quoting Roberts v. United States Jaycees, 468 U.S. 609, 623

(1984)).  Had the Bridgewaters been expelled from the group before the dispute over the menu at the Masquerade Ball and been advised plainly and honestly that the reason for the expulsion was Elizabeth's and Alyssa's disruptive conduct, any attempt at forced reintegration of the Bridgewaters into FACES would have raised serious questions about infringement upon FACES's right to expressive association.

But that is not what happened here.  FACES's expulsion of the Bridgewaters in this case, the announced reasons for which were the Bridgewaters' disruptiveness, was found to be retaliatory because of its sequence and timing.  And while I concur in the majority's resolution of the matter, I think it important to state clearly that it is only FACES's retaliation, as found by the ICRC, that prevents the ICRC's order from amounting to an infringement upon the group's right to expressive association.

I think it unfortunate that we have been brought into a private dispute between two religiously-oriented parties who have chosen not to engage the public education system.  Yet one seeks to entangle the other in a quest for accommodation typically required of public educational institutions, while the other has organized itself in a way that seeks to exempt the group almost entirely from our state's civil rights laws while claiming special status under the tax code.

I do not think that the legislature's broad intent when it enacted our civil rights statutes involved making the ICRC and our courts arbiters of such private disputes as have arisen between FACES and the Bridgewaters.  But constrained by the language of

the statute and mindful of our obligation to avoid constitutional questions, I reluctantly, but respectfully, concur in result.